TEXAS & ST. L. RY. Co. in Missouri and Arkansas *v.* RUST and another.

*(Circuit Court, E. D. Arkansas.* April Term, 1883.)

1. REMOVAL OF CAUSE—JURISDICTION OF CIRCUIT COURT, WHEN ATTACHES.

Upon filing the required petition and bond, in a state court, in a cause removable under the act of congress, the jurisdiction of the state court ceases, and that of the circuit court immediately attaches. The entering of a copy of the record in the circuit court is necessary to enable the court to proceed, but its jurisdiction attaches when the requisite petition and bond are filed in the state court.

2. SAME—FILING OF RECORD—TIME.

The act of congress requires the party removing the cause to file a copy of the record on the first day of the next session of the circuit court occurring after the removal. But it may be filed by either party before that time; and when

filed, and upon due notice, the circuit court will make such interlocutory orders in the case as may be necessary to preserve the property or protect the rights of the parties.

3. Same—Motion Made in State Court—Receiver—Injunction.

Where an injunction is granted and a receiver appointed by the state court without notice to the defendants, and no motion to dissolve the injunction and discharge the receiver is made and acted upon in the state court before the removal of the cause, such motion may be made and heard in the circuit court, upon due notice to the plaintiff, at any time after the record in the case is filed in that court.

4. Specific Performance—When Decreed.

Before a court can decree a specific performance of a contract, the party seeking the relief must establish his right thereto by satisfactory evidence, and this can only be done on the final hearing of the cause.

5. Same—Case Stated.

The plaintiff railway company entered into a contract with the defendants for the construction by the latter, for the former, of a railroad bridge across the Arkansas river. Differences arose between the parties as to their respective rights under the contract, which resulted in stopping work on the bridge. The plaintiff thereupon filed a bill, asking the court to take possession of the defendants' plant and complete the bridge, with funds to be furnished by the plaintiff; leaving all questions of difference between the parties for future settlement or adjudication. *Held*, that the court had no power to seize and use the defendants' plant, and that it would not undertake the work of completing the bridge.

On the twenty-second of April, 1882, a contract was entered into between the plaintiff railway company and Rust & Coolidge, the defendants, for building a railroad bridge across the Arkansas river. The defendants were to complete the bridge by the first of November, 1882, and were to receive therefor the sum of $305,000, to be paid on "*pro rata* monthly estimates, ninety per cent. thereof to be paid during progress of the work, upon material furnished and work performed, and balance due upon completion thereof."

The contract contains this provision:

"In case of non-completion of the bridge upon November 1, 1882, or of providing a crossing for trains by said date, then, in such event, the sum of $1,000 per week, for the period of time such completion or provision for crossing of trains is delayed, shall be deducted from said contract price; and in like manner, should the bridge be completed at an earlier date than November 1, 1882, then, in such event, the sum of $1,000 per week shall be added to said contract price for the period by which said fixed date of completion shall be anticipated."

Rust & Coolidge entered upon the work of building the bridge, but it was not completed the first of November, and is not yet completed. The defendants continued to work on the bridge, and their monthly estimates for work done and materials furnished were honored and paid by the railway company down to and including the month of April, 1883. The total amount thus paid by the railway company to the defendants under the contract was $268,000.

The May estimate for work done and materials furnished, amounting to $15,932.58, after deducting the 10 per cent., the railway company refused to honor. In a letter of the defendants of June 29, 1883, they state that unless the differences between the parties are

adjusted at a proposed conference, "we shall, upon Saturday, July 7, 1883, stop or suspend work upon the Arkansas river bridge until a definite understanding is reached." A conference took place between the president of the railway company and the defendants at Pine Bluff on the sixth of July, 1883. They were unable to reconcile their differences, and on the same day the plaintiff brought suit, by attachment, in the Jefferson circuit court against the defendants for $35,000, being $1,000 per week for the number of weeks that had elapsed since the first of November, 1882, and caused the defendants' plant at the bridge, consisting of machinery, tools, houses for hands, camp, camp equipage, and provisions to be attached. The next day the plaintiff filed a bill against the defendants on the equity side of the Jefferson circuit court, setting up, in substance, that the road was completed and ready for traffic, and that the running of trains thereon was only prevented by the non-completion of the bridge; that the bridge could be completed in 20 or 30 days; that the defendants had been paid the full contract price for building the bridge, counting as part payment the weekly forfeiture of $1,000 for 35 weeks; that at the conference between the president of the railway company and the defendants, the day previous, the latter demanded of the plaintiff, as a condition of going on with the work, a release from all claims for damages by reason of the delay in the completion of the bridge, and also $20,000 for extra work and materials, and threatened, if these demands were not acceded to, to stop work on the bridge and remove their plant out of the state; and that plaintiff believed they would carry their threat into execution, unless restrained; that the plant for the construction of the bridge was of such a character that, if removed, it would cost a large sum of money and take months to replace it; and that the plaintiff and the public were deeply interested in a speedy completion of the bridge, to the end that the railroad might be opened for traffic. The bill concludes as follows:

"The plaintiff is willing to pay into the registry of this court such sum as shall be necessary for the completion of said work, if such court shall order and direct the progress of the work by a receiver appointed by the court. The premises considered, the plaintiff prays for process according to law that the said defendants, their agents, servants, or employes, and all other persons, be restrained and enjoined from destroying, injuring, or interfering with, or removing, said tools, machinery, or appliances necessary to said work, or the materials used therein; and that a receiver be appointed by the court to take charge of said work, and the material, fixtures, and tools used therein, and proceed to carry out and complete the same in accordance with the specifications thereof, and for said purpose be fully authorized to employ men and labor, and use the tools of defendant therefor."

Upon filing this bill, without notice to the defendants or their agents, the state court made an order enjoining the defendants from taking possession of, using, or in any manner interfering with their plant at the bridge, and appointing a receiver "with full power and authority, so far as possible for him to do, to carry out and execute

in full, and according to the specifications thereof, the contract between the plaintiff and defendants in relation to the building of said bridge, and for said purpose he is hereby authorized and empowered to take charge of and use all material now in the vicinity of said work, together with all the tools, machinery, or other appliances necessary to the work thereon, offices and houses for hands, kitchen and dining-room furniture," and concludes with an order to the sheriff to turn over to the receiver the defendants' plant in his custody on the writ of attachment. The order does not state from what source the receiver is to obtain funds to carry on the work. On the ninth of July the defendants filed in the state court their petition and bond for the removal of the cause to this court, on the ground of the citizenship of the parties. The record in the case was filed in this court on the twelfth of July, and afterwards the defendants, upon due notice to the plaintiff, moved to dissolve the injunction and discharge the receiver. Thereupon the plaintiff moved for leave to amend its bill, which leave was given, and an amended bill filed accordingly. The amended bill sets out at length the contract and correspondence between the parties; repeats the allegations of the original bill, with some variations of statement and addition of detail; alleges that the defendants, in making their proposal and estimates for the building of the bridge, included in the same the value of the use of the plant, tools, and machinery required to be used by the defendants in the construction of the bridge, and that the estimates that were made from time to time included the value of the use of said plant, and entitled plaintiff to the use of said plant until the completion of the bridge; that at the Missouri and Texas state lines the plaintiff's road connected with roads in these states, making the road in this state a connecting link in a continuous line extending from Gatesville in Texas to Cairo, Illinois, a distance of about 750 miles, and that as soon as the bridge is completed so that trains can cross thereon, the United States mail will be carried over the whole of said line; that the bridge is so nearly completed that the same can be finished in 20 days, at an expense of not more than $10,000, "in connection with the use of the materials, tools, machinery, and plant now at said bridge," but that if defendants are allowed to remove their plant the bridge cannot be finished in a less period than six months, and at a cost of not less than $50,000; that plaintiff "is willing to pay and indemnify the defendants from any and all loss which they may sustain by reason of the institution of this suit, if wrongfully brought, and the use of the plant and property of the defendants by the receiver in the completion of said bridge." The bill does not allege that the defendants are insolvent. The defendants have filed an answer to the original and amended bill, in which the delay in the construction of the bridge is stated to have arisen from sickness of laborers,—particularly skilled laborers, whose places could not be supplied,—from bad weather, repeated and unlooked-for floods in the

river, and other causes of like nature; that from these and like causes the plaintiff was delayed in the construction of its road, and had no use for the bridge down to the time of the institution of this suit; that plaintiff never complained at the delay in the construction of the bridge, and paid the monthly estimates for work and material promptly down to and including the April estimate, and that it waived the weekly forfeiture of $1,000 for the non-completion of the bridge after the first of November; that the whole of the May estimate was due to them, and that plaintiff's refusal to pay same was without excuse or justification; that there is a large sum due defendants for extra work and materials; that defendants did not stop work on the bridge of their own will, but that the work was stopped by the levy of the plaintiff's attachment on the defendants' plant; that defendants did not intend to stop work after their interview with the president of the company, and that at such interview they did not threaten to stop work on the bridge and remove their plant unless the plaintiff would release all damages for non-completion of the bridge and pay them $20,000 for extra work; denies that the defendants or any of their agents, with their knowledge and consent, injured or damaged the plant or materials for the bridge in any way; and denies that plaintiff has paid for the use of defendants' plant, or is entitled to the use and possession thereof.

Several affidavits were filed in support of the answer.

*H. K. & N. T. White, Phillips & Stewart,* and *John McClure,* for plaintiff.

*M. L. Bell* and *U. M. & G. B. Rose,* for defendants.

CALDWELL, J.   It is settled that upon filing the required petition and bond in the state court, in a cause removable under the acts of congress, the jurisdiction of the state court ceases, and that of the circuit court of the United States immediately attaches.   The entering of a copy of the record in the circuit court is necessary to enable that court to proceed, but its jurisdiction attaches when the requisite petition and bond are filed in the state court.   *Nat. Steamship Co.* v. *Tugman,* 106 U. S. 118; [S. C. 1 Sup. Ct. Rep. 58;] *Railroad Co.* v. *Koontz,* 104 U. S. 5.

The act of congress requires the party removing the cause to file a copy of the record on the first day of the next session of the circuit court occurring after the removal.   But it may be filed by either party before that time.   And where any order or direction of the court is necessary to preserve the property in litigation, or protect the rights of the parties before the next session, the court will grant leave to either party to file the record, and will make such interlocutory orders as the case seems to require, and as it would have power to make between the commencement of an action originally brought in that court and the term at which it could be tried.   Section 6 of the act of March 3, 1875, provides that the circuit court shall proceed

in a removal cause as if had been originally commenced in that court, "and the same proceedings had been taken in such suit in said circuit court as shall have been had therein in said state court prior to its removal."

Undoubtedly, if this cause had been commenced in this court, and an injunction granted and a receiver appointed without notice, the court, upon notice to the plaintiff, would have heard a motion to dissolve the injunction and discharge the receiver before the term at which the case would be triable.

If this cause had remained in the state court, the defendants would have had the right to make this motion and had it determined before the term to which the writ was returnable. Gantt, Dig. §§ 3477–3480.

But the defendants were not bound to make the motion and submit it to the determination of that court. If they had done so, and that court had denied the motion, and they had then removed the cause, this court would not have entertained the motion on the same record until the trial term. *Hot Springs Cases*, MS. Op.

But the injunction having been granted, and the receiver appointed without notice to the defendants, and no motion to dissolve the injunction and discharge the receiver having been made in the state court, such motion may be made, upon notice to the plaintiff, in this court at any time after the record is filed. Dillon, Rem. § 80, p. 99; *Mahoney Mining Co.* v. *Bennett*, 4 Sawy. 289.

In disposing of the motion before the court it is not necessary to determine whether a court of chancery will, in any state of case, undertake to enforce specific performance of a contract to build a railroad bridge. The plaintiff's bill is not one for specific performance of the contract to build the bridge. The bill is an anomaly in equity pleading. No precedent for it has been produced, and it is believed none can be found. It is not framed to secure a specific performance of the contract by the defendants, nor to settle the controversy between the parties. Whether the plaintiff waived the right to the $1,000 per week after the first of November; whether the defendants were entitled to be paid the May estimate; and whether they are entitled to receive anything for extra work and materials,—are matters which are material and necessary to be determined before specific performance of the contract could be decreed, if, under any circumstances, a court of equity would undertake to enforce specific performance of such a contract; and yet all these disputed questions, the determination of which would be absolutely essential before it could be known whether the plaintiff was entitled to the aid of a court of equity to enforce specific performance of the contract, are by the bill in terms left to be determined after the court has taken it upon itself to seize the property of the defendants and complete the bridge; and then these questions are not to be determined in *this* suit, but in the

suit at law already pending, and such other suits as may hereafter be brought, or by convention of the parties, or by arbitration. The exact language of the bill on this point is that—

"The plaintiff is willing to waive for the time being all questions and differences in relation to the construction to be placed upon the said contract between the complainant and the defendants, as well as the amount that may may be due from one to the other, and hereby proffers to advance this *court*, or to the receiver hereinafter prayed for, such a sum of money as will fully pay for the completing of said bridge, leaving all questions of differences between the complainant and the defendants to be hereafter settled without prejudice to the rights of either of the parties hereto, by compromise, arbitration, or in due course of law, as the said parties may elect."

It is an elementary principle of equity law, that, before a court can decree a specific performance of a contract, the party seeking such relief must establish his right thereto by satisfactory evidence, and this can only be done upon final hearing of the cause. It cannot be done upon an *ex parte* statement, and without notice to the party against whom the relief is sought. In this case, as it stands, there is nothing from which the court can form any opinion to the merits of the case. There is no evidence on the essential points of difference—nothing but the opposing statements of the parties. If, as claimed by defendants, the plaintiff waived the weekly forfeiture, and they are entitled to compensation for extra work and labor, then they were entitled to have the May estimate honored, and the party in default is the plaintiff. So far from asking that the defendants be required to specifically perform the contract on their part, the court is asked to take from them their tools, machinery, camp, and camp equipage, and enjoin them from doing anything in the premises.

Stripped of its irrelevant and declamatory statements, the case made by the bill is this: That the plaintiff and defendants have a misunderstanding as to their respective rights under the contract for building the bridge; that the materials are on the ground to complete the bridge, and that with the use of the defendants' plant—consisting of machinery, tools, and camp equipage—it can be completed in a short time; but that without the use of this plant the completion of the bridge will be much delayed and its cost enhanced, to the great damage of the plaintiff and the inconvenience of the public; and that the use of the defendants' machinery and tools is absolutely necessary to avoid the delay and damage to the railroad company and disappointment to the public. Upon this showing, an injunction is prayed against the defendants, enjoining them from using or taking possession of their machinery, tools, and entire plant used in carrying on the work on the bridge; and the *court* is asked to take possession of this plant, and go forward with the work and complete the bridge "in accordance with the specifications;" the plaintiff generously promising to furnish the means to discharge the pecuniary obligations incurred by the court in carrying out the enterprise, and also offering to give a bond

to pay the defendants the value of the rent of the tools during the time they are used by the court. It is the defendants' plant for building the bridge, and not the materials which enter into the construction of the bridge, which the court is asked to seize and use. The materials for the bridge belong to the plaintiff; the plant to the defendants. What authority has a court of chancery to seize and use the property of one citizen for the benefit of another, without a trial or a hearing? No exigency of a railroad company, and no considerations of public convenience, however great, will justify the act to the law.

If the necessities of the plaintiff, and the public necessity, will warrant the seizure and use of the defendants' tools and machinery, it is not perceived why the same considerations would not make it the duty of the court to seize and use the tools of other citizens, or the mules of the neighboring planters. Courts possess no such absolute and despotic power over the property of the citizen. The citizen cannot be deprived of his property or its possession "without due process of law," and a simple bond to pay the owner the value of a forced loan of his property is not the equivalent of the due process of the law contemplated by the constitution. In effect, the court is asked to compel a forced loan of the defendants' tools, machinery, and camp equipage, and when it secures possession of them it is asked to use them in completing the bridge, and to appoint an agent for that purpose. A receiver is the agent of the court; he is an officer of the court, and his possession is that of the court. He is not the agent of either party, and neither party is responsible for his misfeasance or malfeasance. And for this reason courts should not assume to place the private property of the citizen, or the conduct of his business, in the hands of a receiver, except where both the right and the necessity to do so are clear.

Courts are poorly adapted to the business of building railroad bridges. If not properly constructed, the most serious consequences to life and property are likely to result. Their proper construction requires a high degree of engineering skill, which this court does not possess. Any court which engages in the business is liable to commit grave mistakes, and inflict great wrong and hardship, for which the injured parties will have no redress; for the errors and mistakes of the court, though they may ruin a citizen, are placed in the category of injuries produced by the law, and for which the law furnishes no redress. Certainly no court ought to engage in the business, when it would have to resort, in the beginning, to the exercise of such questionable powers to get the tools to carry on the work. It is obvious that the sole object of the bill in this case is to obtain, through the agency of the court, the use of the defendants' plant until the bridge can be finished. If the court should continue the forced loan of the defendants' tools and complete the bridge, it would have to settle with the plaintiff for the money received, and there

this case would end, leaving every question is dispute between the parties where it stood when this case was begun.    This would be proceeding by inversion.    The method has too much the air of that proceeding by which a man is first hung and tried afterwards to find favor in a court of equity.

Let an order be entered dissolving the injunction and discharging the property from the custody of the receiver, and requiring him to return the same to the officer or person from whom he received it, and to pass his accounts in the master's office without delay.

See *City of Chicago* v. *Hutchinson,* 15 FED. REP. 129; *Glover* v. *Shepperd,* Id. 833: *Phœnix Mut. Life Ins. Co.* v. *Walrath,* 16 FED. REP. 161; *Public Grain & Stock Exchange* v. *Western Union Tel. Co.* Id. 289.—[ED.