PULLMAN PALACE CAR CO. *v.* TEXAS & PACIFIC R. CO.*

*(Circuit Court, E. D. Texas.  April, 1882.)*

1. INJUNCTION—SPECIFIC PERFORMANCE.

No decree should be entered or order allowed for the specific performance of a contract, where there is not a mutuality of remedy between the parties obtainable from the court.

2. SAME—WHEN NOT GRANTED—LAPSE OF TIME.

The court will not allow an injunction to compel the specific performance of continuous covenants with intricate detail, running through a period of nine years, over a vast system of railways, unreasonably taxing the time, attention, and resources of the court and its officers, and interfering in the general administration of justice.

3. CONTRACT IN NATURE OF A MONOPOLY.

Courts ought not to favor a monopoly in the accommodations which are necessaries to the traveling public, or foster it by the invention or application of extraordinary or unusual orders or remedies.

*O. A. Lochrane* and *E. S. Isham,* for complainant.

*John H. Kennard, W. W. Howe, S. S. Prentiss,* and *John C. Brown,* for defendant.

PARDEE, C. J.   The complainant sets forth in its bill an agreement alleged to have been made on the twenty-eighth day of February, 1874, with the defendant company, whereby the Pullman Company was to furnish sleeping cars to be used by the railway company, sufficient to meet the demands of travel on its line of road, to provide the necessary attendants therefor, and also keep said cars in good running order and repairs, except repairs and renewals made necessary by accident and casualty; it being understood that the railway company should repair all damages to said cars, of every kind, occasioned by accident and casualty.   The railway company was to pay the Pullman Company for the use of said cars four cents per car per mile for each mile run, and the railway company was to repair the cars in its own shops at cost price for the Pullman Company.   Settlements to be made monthly.   The railway company to furnish and apply lubricating materials, and provide fuel and lights for, and wash and cleanse, said cars.

The railway company was to permit the Pullman Company to place its tickets on sale at the ticket offices of the railway company, and to permit the Pullman Company to collect from passengers using said

*Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

cars "such sums as may be usual on competing lines furnishing equal accommodations." The Pullman Company was to furnish free passes on its cars for the general officers of the railway company, and the railway company to furnish free passes to the general officers, conductors, and porters of the Pullman Company when on duty. This agreement was to continue for *two years*, say till February 28, 1876, "unless another agreement shall have been entered into, as provided in the seventh article; but in case either of said companies should at any time fail to observe the covenants so entered into, it might be terminated by notice." By this seventh article it is alleged the Pullman Company was given "the option, if exercised within two years from the date hereof, to determine whether it will make with the Texas & Pacific Railway Company a contract of the form and kind hereunto attached and marked 'H,' and that if the Pullman Company shall within the said two years determine to make such contract, then and in that case the Texas & Pacific Railway Company *shall enter into* such contract with the Pullman Company."

The "Contract H," so annexed, is a blank form of agreement "between ————, hereinafter called the railway company, and Pullman's Palace Car Company," and contains a considerable preamble and 15 articles, which may be briefly summarized:

(1) The Pullman Company is to furnish its cars sufficient to meet the requirements of travel over the lines of the railway company now controlled or hereafter to be controlled by ownership, lease, or otherwise; said cars to be satisfactory to the general manager or superintendent of the railway company.

(2) The Pullman Company agrees to keep carpets, upholstery, and bedding in good order, and to make certain repairs.

(3) The Pullman Company agrees to furnish and pay certain employes on said cars.

(4) The railway company is to furnish certain free passes.

(5) The Pullman Company is to furnish certain free passes.

(6) The servants of the Pullman Company are to be governed by the rules of the railway company, and sundry provisions are made for liability in case of their injury, and indemnity by the Pullman Company.

(7) The railway company is to have said cars on the passenger trains of its lines, now or hereafter to be controlled, in such way as will best accomodate passengers desiring to use them, and furnish fuel, lighting material, and make certain repairs and renovations.

(8) The railway company is to furnish without charge, at convenient points, room and conveniences for airing and storing bedding.

(9) The Pullman Company is to collect certain fares.

(10) The railway company is to permit the Pullman Company to place its tickets on sale at the railway ticket-offices, and their sale to be made by the railway's agents free of charge.

(11) The Pullman Company is to have the exclusive right for 15 years to furnish such drawing-room, parlor, sleeping, and reclining chair cars on all passenger trains of the railway company, on its entire lines, present, prospective, now controlled or hereafter to be controlled by ownership, lease, or otherwise, and also on all passenger trains on which it may, by virtue of contracts with other roads, have the right to run such cars, and the railway company is to agree that it will not contract with any other parties to run said class of cars over said lines of road for 15 years.

(12) The Pullman Company is to guaranty the railway company against damages for infringements of patents and expenses of litigation, etc.

(13) Elaborate provisions are made in regard to cleansing and repairing cars in case of default by party charged with this duty.

(14) Provisions are made for each party having the right to terminate the contract in case the other does not comply with its obligations.

(15) Provisions are made whereby the railway company might, on certain terms, acquire a half interest in all the equipment so furnished.

The bill alleges that on or about the fourteenth of February, 1876, the complainant notified the defendant that it would exercise the option aforesaid, and sent to defendant a letter advising it that "your orator had thus decided, and that on and after the twenty-eighth day of February, 1876, it would operate its cars upon the lines of the railway company, under the terms of the said contract marked 'H,' as aforesaid, and your orator causes duplicate copies of said contract to be prepared, which were duly executed *on the part of your orator*, and sent by your orator to the said Texas & Pacific Railway Company for *execution by said company*." The bill then alleges that complainant has continued to operate its cars on defendant's roads under the authority and provisions of said contract, and then alleges that the defendant has notified it that its cars will not be handled any longer. It charges "that the officers and agents of the Texas & Pacific Railway Company do publicly declare that the said railway company has, by contract with others than your orator, engaged for use on its said road, on and after the fifteenth day of December, 1881, other and different drawing-room and sleeping cars than those of your orator, namely, the cars of the company known as the Wagner Sleeping-Car Company, and your orator has reason to believe, and does believe, that on and after the fifteenth day of December, 1881, the cars of your orator will be put off the line of the said Texas & Pacific Railway Company, and their use discontinued, and the cars of persons other than your orator substituted therefor in the operation of the business of said road, in violation of the express terms and provisions of the contract," etc.

The Wagner Company is not made party.

After sundry allegations of apprehended injury the complainant proceeds to ask for an injunction, which is the only relief requested.

The injunction is asked for in the following form:   That the defendant—

"May be enjoined and restrained from *discontinuing* the use and employment of the cars of your orator, on and after the twenty-second of December, 1881, over its line of railroad; and from refusing to handle the cars of your orator upon any of the passenger trains contemplated and referred to in and by said contract; and from refusing to keep for sale and to sell, at their ticket offices, tickets for the accommodations furnished upon your orator's cars, as provided in said contract; and from making or entering into any contract or agreement with any person other than your orator for the supplying of drawing-room and sleeping cars for use upon the line of said Texas & Pacific Railway Company; and from permitting any other person than your orator to engage upon said line of road in the business of furnishing such cars as aforesaid for the use of said road; and from hauling said cars, for any other person than your orator, upon any of the trains of the said Texas & Pacific Railway Company; and from selling, offering for sale, or allowing to be sold, at the ticket offices or other places under the control of said railway company, the tickets of any other person than your orator, for the accommodation of drawing-room and sleeping cars operated on said road; and from transacting and operating upon the said road the business of drawing-room and sleeping cars, *or other cars of the sort*, contemplated by the contract aforesaid with the said Texas & Pacific Railway Company, except in accordance with the provisions of said contract with your orator; and from violating any of the covenants or agreements in said contract contained; and for such other relief," etc.

On this bill a restraining order has been granted in the terms prayed in the bill for a final injunction, and the question now presented to the court is whether such an injunction shall issue pending the suit.

The parties have had ample notice for preparation, and counsel have presented the case fully on all the merits it has, and a decision on this question should be decisive of the whole case.

It is not necessary, nor have I the time, to argue fully on all the points presented.   I shall merely try to present my conclusions so that they may be understood by counsel.   It is not necessary that the Wagner Sleeping-Car Company should be a party to this suit. That company was no party to the original contract.   The bill does not declare it to have any subsequently-acquired rights, and clearly it can have no rights that would affect this litigation, or control in any manner the remedies sought by the complainant herein, nor will

any decree rendered herein injure or affect that company any more than it will any other person who may have acquired rights subordinate to complainant's contract. For the general rule see Pomeroy, 544; also see *Willard* v. *Tayloe,* 8 Wall. 557.

The contract set out and detailed in complainant's bill is a valid subsisting contract, and as binding on the defendant in a court of equity as though it had been regularly signed, sealed, and delivered, according to the terms of the first agreement between the parties. *Willard* v. *Tayloe,* 8 Wall. 557; *Pearce* v. *Cheslyn,* 4 Adol. & E. 225; *Atwood* v. *Vincent,* 17 Conn. 581.

After the first contract between the parties was entered into, all that was necessary to complete the obligations of the second contract was the exercise of the option of the complainant, as stipulated, in time and according to the terms of the first agreement. It was a continuous offer from the defendant, forming a complete contract when accepted by the complainant. *Boston, etc., R. Co.* v. *Bartlett,* 3 Cush. 224; *Wright* v. *Brigg,* 21 Eng. C. L. 591; 2 Chit. Cont. 1061. Nor do I think that the alleged contract is affected by the statute of frauds of the state of Texas. See same authorities, and *Pearce* v. *Cheslyn,* 4 Adol. & E. 225. Nor is it in violation of the laws of Texas, referred to in argument, nor of the charter of the defendant company. The defendant has the right to run its own cars over its own road. These cars may be purchased or leased by the defendant from anybody or company able to supply them.

The alleged contract is one for the lease of cars to be run by the defendant on its own trains over its own roads. The defendant is not obliged by its charter or by the laws of Texas to lease cars from every comer. By simply leasing all the cars it may need from one car manufacturing company, the duties and obligations of the defendant as a common carrier would not be affected, nor would the obligations of the defendant arising under the particular laws of Texas to haul and transport the cars and freight of other roads be thereby affected. Now, taking these views to be correct, and considering that, as alleged in the bill, the contract between the parties is valid and subsisting, and cognizable in a court of equity, and probably in a court of law, (see *Pearce* v. *Cheslyn, supra,*) it is to be seen whether this court should enforce the contract by equitable remedies, or should remit the parties to damages to be recovered at law, for any violation of the contract suffered by either party.

1. Any injunction issued in this case and granting relief to the complainant, whether mandatory to compel the performance or pro-

hibitory to restrain the violation of the contract on the part of the defendant, substantially amounts to a decree or order for the specific performance of the terms of the contract. No such decree or order should be rendered when there is not a mutuality of remedy between the parties, obtainable from the court. If the position of the parties were reversed, it does not seem that there could be any order for the Pullman Company to comply, because the court could not compel that company to build cars or purchase cars, or furnish cars "sufficient to meet the requirements of travel" over the extensive lines of the railway company. Nor, in such a case, could any order be issued restraining the Pullman Company from furnishing cars to other railway companies until the contract should be complied with, for the contract has no such scope; and, as is shown, the Pullman Company has just as valid contracts to furnish cars to other railway companies as it has with the defendant. As to mutuality in the equitable remedy, see Pomeroy, Spec. Perf. § 162 *et seq.*, and cases cited in note 1, on page 231; *Marble Co.* v. *Ripley*, 10 Wall. 358.

2. A decree restraining the defendant from violating the contract, amounting, as it would, to a mandate to comply with the contract, compels the court to supervise and control the performance of continuous covenants, with intricate details, running through a period of nine years, over a vast system of railways, involving large discretion, and the employment of an army of expert agents and business men, "unreasonably taxing the time, attention, and resources of the court and its officers, and interfering in the general administration of justice." See Pomeroy, Cont. & Spec. Perf. § 307 *et seq.*; also *Marble Co.* v. *Ripley*, 10 Wall. 358, and 13 Ohio St. 344. There is a wide distinction to be drawn between this case and the *Telegraph Co. Cases* in 1 McCrary, 541 to 570, and the *Sewing Machine Case* in 1 Holmes, 253 *et seq.*

3. The contract is silent as to the number of cars to be furnished by the complainant and hauled by the defendant. It is also silent as to what passenger trains the cars furnished shall be hauled on or attached to, on day trains, night trains, or excursion trains. The defendant is to procure all the cars of the class needed from the complainant, and the complainant is to furnish cars "sufficient to meet the requirements of travel."

The right, then, to determine what cars and what trains are "sufficient to meet the requirements of travel," is vested by the contract and by the nature of things in the defendant company. An injunction to the defendant restraining the hauling of any other cars

than those furnished by the complainant takes away the power of the defendant to determine what cars are "sufficient to meet the requirements of travel," and vests it permanently in the complainant, (for the defendant can have no other cars than the complainant sees fit to or can furnish,) and, finally, after necessary delay, and possibly after the occasion has passed or the need lapsed, in the court. It is true that the complainant's failure to perform the stipulations imposed upon him by the contract would *at once* cause a dissolution of the injunction; but the dissolution of the injunction can only be ordered by the court, and the court can only dissolve after notice, a hearing, and a finding, and the *at once* becomes an indefinite time, controlled by the mutations and delays of a litigation, and that through more than one court.

4. Sleeping cars and drawing-room cars have become a necessity on long lines of railway, such as the defendant is operating. The contract which is the basis of this suit substantially farms out, for a period yet to run of nine years, to the complainant, the exclusive right to these necessary accommodations over the defendant's "entire line of railway, and on all roads which it controls or may hereafter control, by ownership, lease, or otherwise, and also on all passenger trains on which it may, by virtue of contracts or running arrangements with other roads, have the right to use" such accommodations, to be by the complainant relet and hired at prices and charges wholly within its own discretion, and beyond the control of the defendant or of the public. It is true that the ninth article of the contract provides that the complainant "shall be entitled to collect from each and every person occupying said cars such sums for said occupancy as may be usual on competing lines," etc.; but such provision is vain, and cannot be enforced, unless, indeed, by a master in chancery who should supervise the sale of tickets and seats. And there is no restriction in the contract to prevent the complainant's owning and controlling the usual charges on competing lines, and it is fully within the scope of complainant's business, as set forth in this record.

No provision is made for the introduction and use of the improvements we have a right to expect within the next decade, looking to the increased comfort and security of the traveling public. And there is no provision or guaranty preserving the rights and duties devolving on the defendant under its charter, or preserving and guarding the rights of the public.

In short, the contract, in all its essential features, is the granting of a monopoly,—a monopoly in the accomodations which are neces-

sary to the traveling public,—a monopoly which the courts ought not to favor or foster by the invention or application of extraordinary or unusual orders or remedies.

5. The matter of enforcing such contracts by injunction is within the sound discretion of the court. See Pomeroy, Spec. Perf. § 35 *et seq.*; *Willard* v. *Tayloe*, 8 Wall. 566; *Marble Co.* v. *Ripley*, 10 Wall. 356.

For the reasons given it seems to me that in the exercise of a sound discretion I should refuse the injunction.

It is therefore ordered that the restraining order heretofore issued in this cause be annulled and revoked, and that the injunction *pendente lite*, prayed for, be and the same is refused.

## NOTE.

MONOPOLY. The giving to one person or set of persons of a trade a benefit which another of the same trade does not get also, is a monopoly.(a)   It is an exclusive privilege granted to a few individuals and their successors incorporated into a society, and prohibiting all others from exercising the same privilege, and violates the fundamental rights of citizens willing to conform to the constitutional regulations and restrictions of the business.(b)   Such a law cannot be sustained under the right of the legislature to pass license laws and police regulations, and to grant exclusive rights for the exercise of public franchises.(c)   Monopolies are against common right, and are unconstitutional and void;(d) and by the common law they are offences *malum in se*, and contrary to public policy.(e)   They are equally injurious to trade and to the freedom of the citizen as "engrossing," and are equally restrained by the common law;(f) and "engrossing" is an offence akin to "forestalling;"(g) and the terms "forestalling" and "engrossing" cover all the practical forms of "regrating," all of which are offences at common law.(h)

There are three inseparable incidents to every monopoly:   (1) That the price of the same commodity will be raised; (2) that after the grant the commodity is not so good and marketable as before; (3) that it tends to the impoverishment of divers artisans, artificers, and others.(i)   All such grants have been held by all the judges of England void at common law, as tending to destroy the freedom of trade, discourage labor and industry; restricting the people from getting an honest livelihood, and putting it in the power of the grantees to enhance the price of commodities.(j)   It has been held that granting such a privilege is a violation of the fourteenth amendment to the consti-

(a) Pirie v. Corp. of Dundas, 29 Upp. Can. Q. B. 407.

(b) Slaughter-house Cases, 1 Woods, 21.

(c) Live-stock, etc., Ass'n v. Crescent City, etc., Co. 1 Abb. (U. S.) 388.

(d) Norwich Gas-light Co. v. Norwich City G. Co. 25 Conn. 19; City of Chicago v. Rumpff, 45 Ill. 90; Mayor of Hudson v. Thorne, 7 Paige, 261.

(e) Rex v. Waddington, 1 East, 167; Case of the Monopolies, 11 Coke, 84b.

(f) East India Co. v. Sandys, Skin. 169; and see Company of Stationers v. Parker, Id. 233.

(g) Rex v. Waddington, 1 East, 143.

(h) See 1 Hawk. P. C. c. 80, § 15.

(i) Case of the Monopolies, 11 Coke, 87a.

(j) Slaughter-house Cases, 16 Wall. 102.

tution of the United States,(*k*) one of the fundamental rights of the citizen being that of pursuing any lawful employment in a lawful manner—the right to choose one's own pursuit, subject only to constitutional restrictions and regulations;(*l*) and every grant made in grievance to the subject, or to his prejudice, is void.(*m*) As Mr. Justice Field aptly says, (16 Wall. 105:) "If the trader in London can plead that he is a free citizen of that city, against the enforcement to his injury of monopolies, surely, under the fourteenth amendment, every citizen of the United States should be able to plead his citizenship of the republic as a protection against any similar invasion of his privileges and immunities."

In England, under the sovereign prerogative, the crown has always exercised control over the trade of the country, and although restrained by the common law and the statutes of monopolies, (21 Jac. I. *c*. 3,) within reasonable limits, it might grant the exclusive right to trade with a new invention for a limited period. This statute did not create, but controlled, the power of the crown;(*n*) and an illegal monopoly was denounced as a public grievance; and, the crown having been informed thereof, it had the power, and it was its duty to remove it, even when information had been given by an alien.(*o*) As long ago as the time of Queen Elizabeth monopolies were denounced as odious and in violation of common right, and the judicial decisions from that day down to the present have continuously repeated the denunciation.

Under our system a monopoly is an institution or allowance from the sovereign power, by grant, commission, or otherwise, to any person or corporation, for the sole buying, selling, making, working, or using anything whereby any person or persons, body politic or corporate, are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade.(*p*) Instead of the exercise of the sovereign prerogative by a grant directly from the crown, restricted by the common law, the legislative power may alter the common law and may establish a monopoly, unless that monopoly be one which contravenes the fundamental rights of the citizen protected by the constitution.(*q*.)

Sir John Culpepper, in a speech in the long parliament, thus spoke of monopolies and pollers of the people: "They are a nest of wasps—a swarm of vermin which have overcrept the land. Like the frogs in Egypt they have gotten possession of our dwellings, and we have scarce a room free from them. They sup in our cup; they dip in our dish; they sit by our fire. We find them in the dye-fat, wash-bowl, and powdering tub. They share with the butler in his box. They will not bate a pin. We may not buy our clothes without their brokage. They are the leeches that have sucked the commonwealth so hard that it is almost hectical." These words, quoted by counsel in his argument in the *Slaughter-house Cases*, 16 Wall. 47, were spoken at a time when monopolies existed concerning wine, coal, salt, starch, the dressing of meats, beavers, belts, bone-lace, leather, pins, and other necessaries, and even to the gathering of rags. How much more appropriate would be this language

(*k*) Live-stock, etc., Ass'n v. Crescent City, etc., Co. 1 Abb. (U. S.) 338.

(*l*) Slaughter-house Cases, 1 Woods, 21.

(*m*) Case of the Monopolies, 11 Coke, 87*a*

(*n*) Caldwell v. Van Vlissengen, 9 Hare, 415.

(*o*) The Queen v. Prosser, 11 Beav. 306.

(*p*) Slaughter-house Cases, 16 Wall. 102.

(*q*) Live-stock, etc., Ass'n v. Crescent City, etc., Co. 1 Abb. (U. S.) 388.

at the present day, when not only articles of comfort and necessity are covered by exclusive grants, but the public lands in large areas to the detriment of agricultural interests, and the channels of commerce to the detriment of trade, are held in private ownership by monopolies, notwithstanding the provisions of the constitution of the United States delegating to the general government the regulation of commerce, and the care and charge of the public domain in trust for the citizens of the republic.

In any view the grant of a monopoly is the abdication of sovereign power in exact proportion to the scope of the exclusive right conferred, and to the exclusion of the common right of the citizen. It creates a sort of *imperium in imperia*, with its own laws, rules, and regulations, and with its own officials to enforce them, and from which there is no appeal and its contracts become the exercise of delegated sovereignty, whether in the case of a patentee who suffers his fabric to be manufactured for a royalty, or of a corporation which levies a tribute on its necessary transport to a market, or opens or shuts up the territory to settlement to furnish such a market according to its sovereign will. The judiciary has ever stood as a bulwark between the power of the monopolies and the common right of the citizen, and to that pure and incorruptible judiciary, such as our system of government affords, must the citizen look for protection and relief. Hence it is well said by his honor, Mr. Circuit Judge *Pardee*, in the case to which this note is appended that "courts ought not to favor a monopoly in the accommodations which are necessaries to the traveling public, or foster it by the invention or application of extraordinary or unusual orders or remedies."—[Ed.

