THE MADISON ATHLETIC ASSOCIATION

*v.*

HELEN M. BRITTIN et al., executors of William J. Brittin, deceased.

[Filed June 19th, 1900.]

1. A renewal of a lease containing an option to purchase recited that the lease was renewed "on the same terms and conditions," and that the option to purchase was to be exercised only on condition that the lessee would enter into a covenant, to be inserted in the deed, to erect a building on the premises to cost a certain sum.—*Held*, that this gave an option to purchase, independent of the question whether the option was *ipso facto* renewed by the mere renewal of the lease "on the same terms and conditions."—*Held, further*, that the agreement was not so unconscionable that a court of equity would refuse to compel specific performance thereof.

2. Equity will not ordinarily enforce specific performance of a covenant by a grantee to build on the premises conveyed, since damages at law for breach of the covenant are generally an adequate remedy, and the court has no power to compel performance of such condition.

3. Specific performance of an option to purchase, which is to be exercised only on condition that the vendee will enter into a covenant, to be inserted in the deed, to erect a building on the land conveyed, will not be denied as against the vendee on the ground that the remedy is not mutual, when it appears that on a subsequent breach of the covenant adequate relief can be obtained by the vendor by the recovery of substantial damages at law.

4. Whether, if the damages recoverable at law, although substantial, would still be inadequate for full relief, the specific performance of the contract to build may be enforced in case of breach, *quære*.

---

Heard on bill, amended bill, answers, replication and proofs.

This bill is filed against the devisees of the vendor for specific performance of a written contract of sale, by which, as is claimed, the testator gave complainant an option to purchase lands leased to them by the testator. The lands in question comprise a tract of land in Madison, fronting about three hundred feet on Central avenue and about five hundred and fifty feet on Brittin street, and were originally leased by testator to complainant by three different leases, each containing a separate option to purchase the portion of the tract contained in each lease. One lease, dated April 12th, 1892, included a lot three hundred and thirty-five feet on Brittin street by three hundred and thirty feet deep, which was rented for five years, from April 1st, 1892, at $75 per year, with an agreement by the lessor to convey to the lessee, for $3,500, at any time during the lease, upon ten days' written notice. Another lease of the same date and for the same term, and for the rental of $5 per year, demised a lot adjoining the first on the south, being seventy feet on Brittin street by one hundred and seventy feet deep, with an agreement by the lessor to convey to the lessee, for $170 cash and $180 stock of the association, at any time during the lease, upon like notice. About a year later, and by lease dated April 12th, 1893, the lessor demised a third tract adjoining the first tract above mentioned on the north and being one hundred and fifty feet on Brittin street by about three hundred feet on Central avenue, for the term of four years, from April 1st, 1893, at the yearly rental of $20. This lease also contained an option to purchase the property leased, during the term and upon a similar notice. The lessor agreed to convey this third tract for $3,000, free and clear, or, at the option of the lessee, for $2,000, provided the lessee "will erect a club-house upon the said premises, to cost not less than $6,000," and in the event of the lessee exercising this option, "then the deed shall contain an agreement by the grantee to build a club-house upon said premises." This lease contained also an option to purchase a portion of the leased property, sixty feet front by one hundred and fifty deep, for $720, free and clear. All of the leases contained provisions allowing the lessee to prepare the grounds, by grading or otherwise, for the games and purposes of an athletic association, and for the erection of build-

11

·ings and structures, which might be removed during the leases and within thirty days thereafter. The association took possession under these leases, and prior to April 1st, 1897, had expended between $2,000 and $2,500 in the grading and preparation of the grounds and in the erection of buildings, fences, .&c. No notice of the exercise of any of the options to purchase was given during the term of the leases, nor were the leases themselves renewed before the terms expired. The association, however, remained in possession of all the lands after April 1st, 1897, and, on April 24th, 1897, a renewal for one year was endorsed on each lease and signed by the lessor. The form of the renewal gives rise to one question in the cause. On the first and second leases (dated April 12th, 1892, for five years), in which the option was for a purchase, free and clear, upon payment of a sum fixed, the renewal was as follows:

"In consideration of one dollar, the within lease is hereby renewed for the term of one year from the first day of April, 1897, upon the same terms and conditions as therein contained, but it is expressly understood and agreed that the option to purchase may be exercised only upon the condition that the said Madison Athletic' Association or its assigns, will enter into a covenant, to be inserted in the deed for the premises, to erect on the premises herein described, or on the premises described in the lease, bearing date April 12th, 1893, a club house to cost not less than six thousand dollars.

"WILLIAM J. BRITTIN. [L. S.]

"Witness: H. C. CONDIT,
. "April 24th, 1897."

The renewal on the third lease (dated April 12th, 1893) was similar, except that the association was to "enter into a covenant, to be inserted in the deed for the premises, to erect *on the premises* a club-house to cost not less than $6,000."

After the execution of these renewals the lessees remained in possession, paying rent, but not exercising any option of purchase before the death of the lessor, in September, 1897. The lessor devised the leased premises to the defendant executors in trust for the other parties defendant. On January 21st, 1898, the association served written notice upon the executors, declaring their desire to exercise their options and to purchase all the leased lands for $5,670 in cash and shares of the association

to the amount of $180, with the obligation, on their part, to erect on the premises a club-house to cost not less than $6,000, and requested deeds for premises to be executed with reasonable despatch, and to insert in the deed for the first tract mentioned in the notice (being the tract leased April 12th, 1893) a covenant, on their part, to erect on said premises a club-house to cost not less than $6,000, tendering themselves ready to accept the delivery of the said deed and pay the purchase-money. The defendant executors refused to execute the conveyances or to acknowledge complainant's right to any conveyance, and the bill for specific performance was filed by the lessee on March 26th, 1898, before the expiration of the leases.

The answer of the defendants to this bill set up, among other defences, that the renewals of the leases made on April 24th, 1897, did not contain a renewal of the options to purchase contained in the original leases.

An amended bill was thereupon filed, by which, in answer to this claim of defendants, the complainant, while insisting that the renewals, as executed, extended to the options as well as to the leases, charged that the agreement between it and the lessor was that the option as well as the leases should be renewed, although some uncertainty might have arisen by the inadvertence of the scrivener in not expressly providing in the renewals "that the within lease and option are renewed," and the amended bill prayed a reformation of the renewals, to conform to the agreement, and a decree for the execution of deeds according to the option and renewals, tendering itself ready to receive the same and pay the full consideration. The answer to the amended bill denies any agreement, upon the part of the testator, to extend the options or any of them; denies that the agreements signed include the options, and set up the statute of frauds as to any agreement outside of the written renewals. The other defences set up by the answers are the mental incapacity of the lessor at the time of signing the renewals, and the unconscionable character of the bargain, it being alleged that the property was worth several thousand dollars more than the price agreed to be paid.

*Mr. Charles A. Rathbun* and *Mr. John B. Vreeland,* for the complainant.

*Mr. Alfred Mills,* for the defendants.

EMERY, V. C. (after stating the issues).

No evidence of mistake upon the part of either the lessor or lessee in reference to the form of the renewal has been offered, and in the absence of evidence showing a mutual mistake of both parties, the agreements for renewal cannot be reformed, but the rights of the parties, so far as they depend on the form of the contract, must be determined by the construction of the agreement as it stands. These agreements for renewal do include an option to purchase the property, of which the lease is renewed by express terms. It is true that in the writing itself the only express subject of "renewal" is *the lease,* and if this "renewal," *eo nomine,* were the only basis for the option, there might perhaps be a question whether a mere renewal of a lease "upon the same terms and conditions," would include an option to purchase contained in the lease. But the further clause contained in the renewal as to the option to purchase, is itself an agreement that the option to purchase mentioned in the lease, and thereby referred to, may be exercised upon certain conditions. This express stipulation in the agreement of renewal, therefore, gives the option, independent of the question whether the option was *ipso facto* renewed by the mere renewal of the lease, upon the same terms and conditions. Upon the question as to the lessor's mental capacity to sign the renewals, I reach the conclusion that this defence is not sustained. While the lessor was a very old man and in a failing condition, the evidence of Mr. Condit, with whom the transaction occurred, satisfactorily establishes the lessor's mental and business capacity, and that the renewals were made by the lessor in the exercise of due deliberation and judgment. Testator's son Henry, in whom the testator had great confidence, and who had with his father settled the terms of the options, originally declined in April, 1897, to advise his father in reference to the renewals, because the original options had given rise to disputes in the

family and Henry told his father that he must exercise his own judgment. Mr. Condit's evidence upon the subject of his dealings with the lessor impressed me as truthful, and taken in connection with the other evidence in the case, as to the lessor's mental capacity, I do not think it has been overcome by the evidence produced by the defendants, and this defence should therefore be overruled. Nor do I think that the defendants have established that the bargain was unconscionable. The admissions of the complainant in a circular issued by it in the fall of 1897, show that a *bona fide* offer for $10,000 had been made for the land, but this offer was based on the condition of the land as improved by the association, at an expense of about $2,000 (not including buildings), and from the evidence it would seem probable that the value of the land for building lots increased somewhat after April, 1897. The value of the whole tract in April, 1897, free and clear, and for the purpose of dividing and selling for building lots, according to the evidence of the most reliable witnesses, ranged from about $7,000 to $8,000, according to complainant's witnesses, to $9,000, according to defendants' witnesses. The sum of $5,670 in cash and $180 in stock was therefore considerably below the actual value of the property, and if these payments had constituted the entire consideration to the lessor, there would be some question as to giving the aid of a court of equity to compel the conveyance. But an important part of the consideration to the lessor was the obligation imposed on the grantee to erect a club-house on the premises costing a considerable sum—$6,000. Such erection, if made, would (or might) increase the value of lessor's other property in the neighborhood, and the evidence of Mr. Condit, as well as the change of the options for the first two tracts leased, show that the lessor relied on this erection of the club-house as a material part of the consideration. As such, it would fairly be an element in the bargain between the parties, reducing the cash price to be paid. What amount of reduction from the cash value should be made, was a question the decision of which should be left to the lessor himself, with whose decison on this point the court should not interfere, unless it is made to appear that the reduction was clearly inequitable. I cannot conclude

upon the evidence presented that the reduction from the cash value of the property, made by the testator, in view of the erection of a club-house on the premises, for the ultimate benefit, as he supposed, of his remaining property, made the bargain an inequitable or unconscionable one, and this defence is therefore overruled.

These conclusions dispose of all the questions formally presented by the pleadings and argued by counsel, but my consideration of the case suggests two other questions arising in the case, the decision of which may affect the complainant's right to specific performance.

The erection of a club-house, as clearly appears by the evidence, was a material part of the consideration to be performed by the complainant, and the complete performance of the contract of sale on the part of the complainant would be secured only by such erection.

The erection of the club-house by the grantee was a material consideration in the lessor's mind in making the contract, and not the mere insertion in the deed of a covenant to erect, leaving him to sue for the indefinite or uncertain damages arising from a breach of covenant. This intention of both parties, that the building should be erected and that the parties should not be left merely to the remedy for a breach of the covenant, would seem to be fairly implied from the whole transaction, and is clearly shown by the lease giving the original option for the third tract. This agreement expressly provides as part of the agreement for the option, that the reduced cash price is to be made, "provided the association will erect a club-house upon the premises," &c., and the agreement for the insertion of the contract in the deed is then also made. But the deed not having yet been actually made or accepted, and the vendee having applied to a court of equity to compel the specific performance of the contract for purchase, the performance on the vendee's part of this agreement to build, would seem to be essential. Mutuality of right to specific performance of a contract is necessary, in order to complete equity, and, as is well settled, such mutuality is secured by the filing of the bill by the vendee in the case of an option to purchase, where the whole considera-

tion is paid or secured to the vendor on the delivery of his deed. The cases cited by complainant's counsel fully establish this rule. But where a material part of the consideration for the deed remains to be rendered thereafter by the vendee, under a covenant to be inserted in the deed, then the mutuality of the right to specific performance of the contract for purchase may depend upon the question whether the covenant to be inserted in the deed can be thereafter specifically enforced against the vendee. If not, the question arises whether in this suit a specific performance should be decreed against the vendor. From the disclosures made in the evidence, it would appear that it is within the bounds of possibility that the association may either not build or not maintain the club-house on the premises.

In this aspect of the case, therefore, two questions arise. *First.* Whether specific performance can be enforced against the vendee of the covenant to build, in the form agreed on, which fixes no time and is definite only in respect to cost; and, if such specific performance cannot be decreed, then, *Second.* Whether a specific performance in this suit must not be denied on the ground of want of mutuality. These questions fairly arise and must be settled in this suit, and inasmuch as they have not been argued by counsel, I will hear further argument on these points reserved.

(These were afterwards argued by the same counsel.)

Upon the points which were reserved for argument by my former opinion in this case I reach the following conclusions, after considering the arguments and briefs of counsel:

The doctrine of the later cases is that the court will not, ordinarily, enforce specific performance of building contracts, not only on the ground that damages at law are generally an adequate remedy, but also on the ground of the inability of the court to see that the work is carried out. *Ryan v. Mutual Tontine, &c., Association, 1 Ch. 116,* cases cited at *p. 128 (1893); Beck v. Allison, 56 N. Y. 366 (1874); Pom. Spec. Perf.* §§ *23, 312.*

One exception to the general rule has been established in England, in cases where a public company takes lands from a landowner on the terms of carrying out certain works, as part of the agreed compensation (*Ryan v. Mutual, &c., Association,*

*supra, 128*), but I have not been referred to any cases establishing an exception to the general rule, in cases of private purchase, where the future erection of building by the grantee on the lands conveyed is a substantial part of the consideration. But while it may be doubtful whether a specific performance can be decreed of the covenant by the grantee to build upon the premises conveyed, I conclude that this doubt should not in the present case deprive complainant of its right to specific performance on the objection that the remedy of specific performance is not mutual. The covenant to build was intended by the parties to be carried out after the conveyance of title, and not as preliminary to such conveyance, and while the actual future erection of the building was in the minds of the parties an essential part of the consideration, which induced a reduction in the cash price to be paid, yet I am satisfied, upon further reflection, that in such cases it must be taken to have been contemplated by the parties, that the conveyance of title was to be made to the grantee before the erection, and that the grantor's security for the subsequent erection of the building was intended to rest upon the good faith of the grantee and the obligation of his covenant to build, to be inserted in his conveyance. In case of a breach of the covenant, these rights of the grantor are to be protected by an action for damages or for specific performance, and these rights, so far as relates to a specific performance, must be left for determination hereafter, if occasion arises.

Covenants for building upon or otherwise improving lands which are sold, to some extent, on the faith of the covenants, are so frequent and advantageous, especially in relation to the sale of urban and suburban property, that it would seem to be unreasonable and prejudicial to remove agreements for sale of land, containing such covenants, from the operation of the usual rule entitling the parties to specific performance, for the sole reason that the court may not afterwards be able to specifically enforce the covenants. The main object of the contract—the purchase and sale of land—is specifically and mutually carried out according to the usual rule and according to the expressed intent of the parties, by the decree for a conveyance containing the covenants for future building expressly provided

for, and this should be directed, if the covenant, which is found to form a substantial part of the consideration, would be effective for the substantial protection of the grantor, either at law or in equity. If upon the breach of such covenant substantial damages could not be recovered, nor specific performance decreed, then, in my judgment, it would not be equitable to compel a specific performance of the agreement to sell, and decree for performance should not be granted. In the present case, it seems to me that upon breach of the covenant to be inserted in the deed, substantial damages at law would be recoverable, one element thereof being the difference between the actual market value of the lands and the cash price actually paid, or at least such part of the difference as can be fairly attributable to the vendor's reliance on the covenant. In *Soames* v. *Edge, Johns. 669 (1860)* (heard on demurrer), B having agreed to build a house on land of A's and to accept from A a lease of the land and house, which lease A agreed to grant when the house should have been built, it was held, on B making default in building, that A was entitled to damages for the non-building (which under the English statute was recoverable in equity), and also specific performance of the contract to accept a lease.

I express no conclusion upon the question whether if the damages recoverable at law, although substantial, would still be inadequate for full relief, the specific performance of the contract to build may be enforced in case of breach.

The form of decree will be settled on notice, if necessary.