PANTAGES v. GRAUMAN et al.

PANTAGES THEATER CO. v. SAME.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1911.)

No. 1,967.

**1.** SPECIFIC PERFORMANCE (§ 75*)—CONTRACTS ENFORCEABLE—CONTRACTS FOR CONTINUOUS ACTS DURING LONG PERIOD.

Equity will not award specific performance where the duty to be enforced is continuous and reaches over a long period of time, requiring constant supervision by the court.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 210; Dec. Dig. § 75.*

Specific performance of contracts requiring performance of continuous acts, see note to Berlinger Gramophone Co. v. Seaman, 49 C. C. A. 103.]

**2.** SPECIFIC PERFORMANCE (§ 6*)—CONTRACTS ENFORCEABLE—WANT OF MUTUALITY.

By a written contract defendant agreed to sell, and complainant to buy, one-half the capital stock of an amusement company organized by defendant for the purpose of conducting a new theater in San Francisco, which had been leased for 10 years. Complainant was to pay $50,000 for the stock, one-fourth in cash and the remainder from his share of the profits. He also bound himself inter alia that the amusement company should be entitled for 10 years, on terms stated, to the first call on vaudeville acts and performances booked in San Francisco by a theater company in which he owned a majority of the stock. Held that, construing the contract in view of the central purpose of the parties to secure and conduct a playhouse and furnish entertainments therein as a business venture, such two provisions of the contract were correlative and not severable, and that, since the agreement of defendant to furnish the performances of his company for 10 years to the amusement company was one which a court of equity could not specifically enforce, it would not decree specific performance by defendant.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 9–11; Dec. Dig. § 6.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. Specific Performance (§ 6*)—Contracts Not Enforceable—Offer to Perform.

Where a contract when executed is not specifically enforceable against one of the parties, he cannot by subsequent performance of those conditions that could not be specifically enforced put himself in a position to demand specific performance against the other party.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 9–11; Dec. Dig. § 6.*]

Appeal from the Circuit Court of the United States for the Northern District of California.

Suit in equity by Alexander Pantages and the Pantages Theater Company against David J. Grauman, Sid Grauman, New York & San Francisco Amusement Company, David Grauman and Sid Grauman, copartners, doing business as David J. Grauman, Claus A. Spreckels, and Rudolph Spreckels, executors of the last will of Claus Spreckels, deceased, and Maurice Asher. Decree for defendants, and complainants severally appeal. Affirmed.

The appellants, as plaintiffs, instituted this suit to compel the specific observance and performance on the part of defendants of a certain agreement entered into October 20, 1909, between Alexander Pantages of the first part and David J. Grauman of the second part. The agreement is as follows:

"That the party of the second part will sell and party of the first part will buy ten thousand shares, being fifty per cent. of the capital stock of the New York & San Francisco Amusement Company, at the agreed price of fifty thousand dollars ($50,000), payable as follows:

"Twelve thousand five hundred dollars ($12,500) cash to be paid when said stock has been properly assigned and placed in escrow with some substantial bank or trust company in the city of San Francisco. The remaining thirty-seven thousand five hundred dollars to be paid therefor is to be retained out of the net earnings or profits on said ten thousand shares or fifty per cent. of said capital stock.

"It is agreed that stock shall be transferred free and clear of all liens and incumbrances and on which party of the first part will not be subject to any further liability or assessment thereon.

"Party of the first part being the owner of a large majority of the capital stock of the Pantages Theater Company, hereby agree that said New York & San Francisco Amusement Company shall be entitled to and have the first call on the vaudeville acts or performances which it shall or may book in the city of San Francisco and known as the Pantages Circuit Acts, for a term of ten years from the date of the opening of the theater, which is to be managed and controlled by said New York & San Francisco Amusement Company.

"The parties hereto shall have equal representation on the board of directors of said New York & San Francisco Amusement Company, and it is agreed that Sid Grauman shall be general manager thereof as long as he shall prove satisfactory to said corporation.

"For the furnishing of the vaudeville acts as heretofore provided for, it is agreed that said New York & San Francisco Amusement Company shall pay a franchise of five thousand dollars ($5,000) per year to the Pantages Theater Company, which shall be payable in weekly installments of ninety-six dollars and nineteen cents ($96.19) each, and it is further agreed that an additional five per cent. commission be deducted from the salary of each of the acts or actors while this agreement shall be in force, unless otherwise authorized by the Pantages Theater Company, and shall be paid by said New York & San Francisco Amusement Company to said Pantages Theater Company.

"It is agreed that the parties hereto shall equally advance or pay any sums necessary in furnishing the said theater.

"Party of the first part, as manager aforesaid and owner of the majority

of the capital stock of the Pantages Theater Company, agrees that in the event of the sale or transfer of said stock, that such transfer or sale shall be subject to all the obligations of its contract to furnish the talent of the Pantages Vaudeville Circuit to said New York & San Francisco Amusement Company as heretofore provided for.

"It is agreed that party of the first part shall have the right to at all times have a representative who shall confer with the manager of said theater to be operated by the New York & San Francisco Amusement Company.

"In the event either party hereto should at any time desire to sell his capital stock or any portion thereof, then the other party shall have the first option to purchase the same at the original cost thereof to each party."

The bill alleges, in so far as it is essential to an understanding of the controversy, that David J. Grauman and Sid Grauman are copartners doing business under the firm name of David J. Grauman; that the New York & San Francisco Amusement Company is a corporation with an authorized capital stock of $200,000, divided into 20,000 shares, with a par value of $10 each; that 10,000 shares of stock have been issued to Sid Grauman, 9,999 shares to David J. Grauman, and 1 share to Maurice Asher, the attorney for the Graumans, who holds the same as trustee only to enable him to act as a director in the corporation; that David J. Grauman in entering into the agreement with Pantages was acting for the copartnership; that some time prior thereto, namely, on August 4, 1909, the defendant David J. Grauman, acting for said copartnership, entered into an agreement with Claus A. and Rudolph Spreckels, executors of Claus Spreckels, deceased, whereby the Spreckels agreed to construct a certain building on Market street, in San Francisco, designed in part for theater purposes, and David J. Grauman to lease the same for a term of 10 years, under certain conditions and restrictions, and that Grauman, acting for the copartnership, has, as plaintiffs believe, assigned the said agreement to the amusement company; that Alexander Pantages is engaged in the business of owning, leasing, and conducting theaters, and managing and presenting theatrical performances, and that the location of said building is peculiarly adapted for theatrical purposes; that the defendants Grauman, though often requested, have refused and now refuse to perform their part of the agreement with Pantages; that on March 12, 1910, Pantages tendered to David J. Grauman $12,500, also an offer on his part to perform all the terms and conditions of the agreement required to be performed, together with an agreement duly executed by the Pantages Theater Company, whereby said company obligates itself that the amusement company shall have the first call on all theatrical acts or performances known as "Pantages Circuit Acts," which the said theater company shall or may book in the city of San Francisco for the said term of 10 years; that Pantages furthermore tendered to the amusement company a like agreement on the part of the theater company; that the consideration moving to Pantages in said agreement was the obtaining of a one-half interest in the amusement company; that, if the said 10,000 shares of stock cannot be transferred as agreed, plaintiffs can be compensated by the conveyance to them of a one-half interest in said theater and the lease thereto; that, as plaintiffs are informed and believe, the Graumans intend selling the stock which they agreed to sell to Pantages, and the amusement company intends, unless restrained, to assign the agreement with Spreckels' executors to some person unknown to plaintiffs.

The prayer is for an injunction against transferring said stock or assigning said agreement or the lease therein provided for, and for a specific performance of the agreement on the part of the Graumans, or that, if it be found impracticable to decree a specific performance of the agreement, then that Spreckels' executors be required to execute a lease to an undivided one-half of said building to Pantages for the term specified.

Subsequently a supplemental bill of complaint was filed setting forth that the Graumans were threatening to sell the remaining one-half of the capital stock of the amusement company in disregard of Pantages' first option thereon to purchase, that Pantages has declared his election to purchase on the terms stipulated, and prays, further, that the court require a transfer of said stock also to Pantages.

Demurrers were in due season interposed to these two bills of complaint by the defendants other than the Spreckels' executors, which, on hearing, were sustained by the circuit court, and decree entered dismissing the cause. The appeal is from such decree.

Charles S. Wheeler and Nathan Moran, for appellants.

Garret W. McEnerney, Walter Rothchild, Charles W. Slack, Charles L. Cushing, and O. K. Cushing, for appellees.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). The honorable Circuit Court sustained the demurrers and dismissed the bills of complaint on the ground of a want of mutuality in remedy upon the agreement which forms the basis of the suit. While this court is not confined in its investigation to the one ground considered, we have concluded that it is determinative of the cause. The solution of the problem depends in large measure upon a proper rendition or construction of the agreement between Pantages and Grauman. If it be conceded, as it must be in view of the demurrers, that David J. Grauman assigned his lease with Spreckels' executors to the amusement company, and that such fact was an inducement for entering into the agreement in question, it may as well be premised that the purpose of the agreement was to give the parties an equal interest in the amusement company's theatrical business, in which it purposed engaging. One-half the amount of money required to be advanced by Grauman to enable him to carry the lease was to be repaid to him under the agreement. This probably accounts for the suggestion of the cash payment. The balance of the purchase price, it will be noted, is to be paid to Grauman out of the net profits of the 10,000 shares of the capital stock of the amusement company agreed to be sold to Pantages. In other words, Pantages' stock was to pay for three-fourths of its agreed value from its net earnings from the theater business.

Further than this, it will prove of assistance to outline what the agreement is in its ultimate analysis. It is as follows:

(1) Grauman agrees to sell and transfer to Pantages 10,000 shares, being 50 per cent. of the capital stock of the New York & San Francisco Amusement Company, free and clear of all liens and liability to assessment.

(2) Pantages agrees to pay $50,000 for said stock, as follows: $12,500 when the stock is assigned and placed in escrow with some substantial bank in San Francisco, and $37,500 to be retained out of the net earnings or profits of his stock.

(3) Pantages agrees that the amusement company shall be entitled to, and have the first call on, the vaudeville acts or performances which the Pantages Theater Company shall or may book in the city of San Francisco, and known as the "Pantages Circuit Acts," for a term of 10 years from the date of the opening of the theater which is to be managed by the amusement company.

(4) Pantages agrees that, in the event of the sale or transfer of his stock, the same shall be subject to all the obligations of the theater

company's contract to furnish talent of the Pantages vaudeville circuit to the amusement company.

Further, it was mutually agreed: (1) That the parties to the agreement shall have equal representation on the board of directors of the amusement company. (2) That Sid Grauman shall be the general manager of the amusement company so long as he shall prove satisfactory to the corporation. (3) That the parties shall equally advance the money necessary in furnishing the theater. (4) That Pantages shall have the right at all times to have a representative to confer with the manager of the theater to be operated by the amusement company. (5) That, in the event either party should desire to sell his capital stock, the other shall have the first option to purchase at the original cost to the holder.

Now, it is urged with much emphasis that the agreement is severable; that the principal and essential conditions thereof consist in the first two stipulations, namely, that Grauman agrees to sell the stock and Pantages to pay the specified consideration therefor, and that all the other stipulations are merely subsidiary to the main agreement, and ought to be so treated in determining whether specific performance should be decreed. In this relation it is furthermore insisted that the stipulation entitling the amusement company to the first call on the vaudeville acts or performances to be booked in San Francisco by the theater company is in purpose and effect an undertaking on the part of Pantages to secure an agreement or obligation on the part of the theater company with the amusement company that it will furnish to the latter company the theatrical attractions specified. In other words, Pantages' agreement in this regard is not a personal covenant with the amusement company that it shall have the said theatrical attractions, but that he will procure the Pantages Theater Company to enter into such a covenant with the amusement company, and that he would fully acquit himself of his undertaking by procuring the theater company to enter into such a covenant or obligation with the amusement company.

The initial and central purpose of the parties being, as previously observed, to secure a playhouse and to manage and conduct the same as a business venture for the profits obtainable, it was most natural that provision should be made for obtaining theatrical attractions. This was done in a measure by providing that the amusement company should have the first call upon the theater company for the acts and performances that the latter should produce upon its circuit in San Francisco. In this Pantages had an interest of his own, or of his theater company, to subserve, for the company was to receive a consideration for granting the privilege of a first call upon its theatrical productions on the circuit. In what way, then, can it be said that this stipulation or covenant is separable or severable from the main agreement? It is tantamount to an undertaking to furnish the amusement for a concern organized and created to produce amusement for public entertainment. Were it not that Pantages was willing to make provision, in part at least, for a supply of theatrical talent, the Graumans would probably not have consented to enter into the agreement at

191 F.—21

all, while it is quite clear that the fact that Pantages would be enabled to furnish such talent was an inducement for him to enter into the business venture. So it would seem that the provision for supplying the theatrical talent for conducting the business of the venture is inseparably connected with the very organization of the business concern itself, and could in no way be treated as subsidiary to the main agreement. If the correlative agreement for the sale and payment for the stock is to be performed, it is also essential to the business venture that the theatrical talent shall be supplied, and it would work an injustice to require a performance of the former without at the same time requiring an observance of the latter obligation.

Nor can we agree with counsel that the undertaking of Pantages is to procure the Pantages Theater Company to agree to supply the talent. It is, in effect, a covenant on his part that the amusement company shall be entitled to the first call on the talent that the Pantages Theater Company shall produce on its circuit in San Francisco. The recitation that Pantages is the owner of a large majority of the capital stock of the Pantages Theater Company is matter of inducement only for the covenant. That being the case, he is willing to agree that the amusement company shall have the first call on the performances to be produced by the theater company on its circuit. The language of this clause is so clear and explicit that there can be no mistake about its meaning. It seems to be thought that there should be something implied here which would carry the idea that Pantages was to secure the agreement of his theater company to furnish the amusement talent, and that his obligation ended there. The idea cannot be interpolated, however, without literally reading into the clause something that is not there. Pantages and the theater company are two entirely different entities, and, if it were intended that Pantages should secure the theater company to agree to furnish the amusement talent, the idea could have been as easily expressed as the one that was put into the agreement. Not having been so expressed, the clause can be given no such intendment. True, a subsequent clause of the agreement would seem to imply that the theater company had entered into a contract, or would, to furnish theatrical talent to the amusement company, but it is perfectly consistent with the former clause if the theater company had agreed with Pantages to furnish the talent for the amusement company. The language of the clause is "its contract," but it does not specify with whom or what company. Nor does the fact that the consideration for furnishing the talent is made payable to the theater company change the rendering. Such a thing may well be, and yet the theater company be in no wise obligated to the amusement company to furnish the talent. While it is believed that the further mutual agreements as denominated in our analysis are, in the main at least, inseparable from the agreement itself, yet with our view of the controversy it is unnecessary to decide as to those at this time.

The legal inquiry remains, which is whether the agreement is susceptible of enforcement by specific performance on the part of Pantages to require the deposit for transfer of the stock on the part of

the Graumans, one or both of them. It is a fundamental principle that specific performance of a contract will not be decreed unless it can be rendered obligatory upon both parties. In other words, the remedy must be mutual; otherwise, it cannot be invoked. Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955; Firth v. Ridley, 33 Beavan's R. 516; Shubert v. Woodward, 167 Fed. 47, 92 C. C. A. 509; Duff v. Hopkins (D. C.) 33 Fed. 599, 608; Pullman Palace Car Co. v. Texas & Pac. R. Co. (C. C.) 11 Fed. 625. Nor, it is held, will the remedy avail unless both parties at the time the contract is executed have the right to resort to equity for its specific enforcement Norris v. Fox et al. (C. C.) 45 Fed. 406. The principle has been carried into the statutes of California, and is enforced by its courts. Pacific Electric Ry. Co. v. Campbell-Johnston, 153 Cal. 106, 94 Pac. 623. Furthermore, equity will not interpose to enforce a part of a contract, unless that part is clearly severable from the remainder; its aim and purpose being to do complete justice. Ogden v. Fossick, 45 Eng. Report, 1249; Ross v. Union Pacific Ry. Co., Fed. Cas. No. 12,080; South Wales Railway Company v. Wythes, 69 Eng. Rep. 422; Merchants' Trading Co. v. Banner, L. R., 12 Eq. Cas. 17; Gates v. Gamble, 53 Mich. 181, 18 N. W. 631. It is otherwise, of course, where the parties have contemplated a piecemeal performance. Odessa Tramways Co. v. Mendel, L. R., 8 Ch. D. 235. So, where two parts of a contract are distinctly separable, it is said:

"There is no reason why one should not be enforced specifically, and the plaintiff compensated in damages for the breach of the other." Adams v. Messinger, 147 Mass. 185, 190, 17 N. E. 491, 496, 9 Am. St. Rep. 679.

It would follow that, if the contract were severable, the plaintiff might have specific performance, while the defendant would be remitted to his action in damages. Croome v. Lediard, 2 My. & K. Ch. R. 252; Minneapolis & St. L. Ry. Co. v. Cox, 76 Iowa, 306, 41 N. W. 24, 14 Am. St. Rep. 216; Lawrence v. Saratoga Lake R. Co., 36 Hun (N. Y.) 467.

[1] So equity will not award specific performance where the duty to be enforced is continuous and reaches over a long period of time, requiring constant supervision by the court. Pacific Electric Ry. Co. v. Campbell-Johnston, supra. And cases are not wanting where specific performance of contracts to convey has been decreed, leaving the grantor to his remedy at law upon covenants stipulated to be entered into on the part of the grantee. Thus, where the execution of a deed with covenants is the substantial part of an agreement, or where its execution would place the party entitled to it in a more favorable position for protecting his rights at law, a court of equity will decree the execution of the deed without regard to whether the covenants are such as will be decreed to be specifically performed. "But," says the Supreme Court of Missouri (Pomeroy v. Fullerton, 113 Mo. 440, 456, 21 S. W. 19, 23), "that a court of equity might go thus far in compelling the plaintiff to perform his contract would not relieve the contract from the objection of want of mutuality; the covenants themselves being of such a character as to be incapable of being specifically enforced in equity, if the thing covenanted to be done, and not

the deed, forms the substantial part of the consideration for which the defendant agreed to part with the title to his property, unless the parties themselves had provided other means effective to secure the performance of such covenants." So it was held in that case that, as the covenant provided for forfeiture and reversion of the premises if not observed, the remedy which the parties themselves had provided was adequate, and therefore that the vendor should be required to perform by executing the deed. To a like purpose is Madison Athletic Ass'n v. Brittin, 60 N. J. Eq. 160, 46 Atl. 652.

[2] It remains to apply these principles to the present controversy. As has been observed, the chief purpose of the agreement was to perfect an arrangement for engaging in the theatrical business. It was necessary to have a playhouse. This seems to have been adequately provided for. It was, furthermore, necessary to secure theatrical talent, and the parties stipulated for that. But it rests in the agreement of Pantages that the amusement company shall be entitled to the first call upon the vaudeville acts and performances to be booked by the theater company in San Francisco. This agreement on the part of Pantages is a continuing affair, to drift over a period of 10 years, and, while the consideration to be paid for the acts and performances is an inducement for the theater company to provide the same, yet the covenant of Pantages is not such a one as equity can or will require to be specifically performed, as it will not interpose to take care that Pantages shall require the theater company to furnish the stipulated talent to the amusement company continuously throughout the entire time designated. And counsel seems to concede that this would logically be the case if the rendition of the agreement were that Pantages should himself see that the theater company furnished the talent, and not that he should procure the agreement of the theater company to that effect, for he says:

"If that contract is not specifically enforceable—and I dare say it is not—neither is any contract specifically enforceable which calls for one party to furnish theatrical talent. If it is broken, the remedy will be at law. * * * But what of it? All that we agreed to do was to provide that contract. We have provided the contract."

[3] We are of the firm opinion, however, that the agreement does not bear the interpretation that counsel contends for, and hence, the premise being erroneous, his conclusion would fail. The procuring of the agreement to be executed by the theater company to provide the talent could not help the plaintiffs; for, if the contract were not specifically enforceable when entered into, nothing that Pantages could do thereafter would render it so. The case of Norris v. Fox et al., supra, is of marked analogy to the present controversy. There Norris agreed to procure a warranty deed conveying to Fox certain land in consideration that Fox would bind himself to convey to Norris, or some one named by him, certain other land. At the time the contract was entered into, the land which Norris agreed to convey was vested in one Robbins. Norris subsequently obtained a deed from Robbins to Fox, which the latter refused to accept. Norris then sued Fox for specific performance, but it was decided that the suit could

not be maintained because of want of mutuality of remedy; the court saying:

"And where a contract when executed is not specifically enforceable against one of the parties, he cannot, by subsequent performance of those conditions that could not be specifically enforced, put himself in a position to demand specific enforcement against the other party. Hope v. Hope, 8 De Gex, M. & G. 731–736; Fry, Spec. Perf. (3d Ed., Amer. Notes) § 443. In the case at bar the agreement of Norris to procure a warranty deed of land at the time belonging to another was of that nature that only an action at law would lie for a breach of the agreement. As Fox could not compel specific performance of the contract when made, and only had his remedy at law by a suit for damages, the complainant must resort to the same remedy."

It follows that the decree of the Circuit Court should be affirmed, and it is so ordered.