## No. 9360.

THE ANTERO & LOST PARK RESERVOIR CO. ET AL. *v.* LOWE
ET AL.

## No. 9363.

LOWE ET AL. *v.* THE ANTERO & LOST PARK RESERVOIR CO.
ET AL.

Equitable action involving the construction of an irrigation system and contracts relating thereto.

### *Decree Reversed.*

1. CONTRACTS—*Parol Evidence.* In the absence of evidence of mutual mistake, fraud or misrepresentation, parol testimony is inadmissable to vary the terms of unambiguous written contracts, and they are to be construed according to the intention of the parties as therein expressed.

2. WATER RIGHTS—*Reservoir Contracts—Public Policy.* A contract with a reservoir company, which is constructing a storage reservoir, for the sale of water rights therein upon a status of equality based upon its capacity to store, with a clause enjoining diligent effort to conserve all the available flow, and absolving the company from liability if less than the maximum capacity is obtainable, is not against, but in conformity with public policy.

3. CONTRACTS—*Public Policy.* Public policy requires that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and enforced by the courts.

4. *Contract for Sale of Reservoir Rights—Construction.* Under a clause in a contract for the sale of storage reservoir rights, providing that the system should on a certain date be turned over to a company to be organized by the subscribers to the rights, the property did not pass *ipso facto* to the contract holders immediately on the date mentioned, there being no company organized to take it over.

5. IRRIGATION DISTRICTS—*Contracts—Power of Board.* Where the electors of an irrigation district vote to purchase an irrigation system to be completed according to certain plans and specifi-

cations prepared by an engineer, the district board is without power to authorize material changes in the plans and any contract entered into by the members thereof materially changing the system from that authorized by the electors, is illegal.

6. CONTRACTS—*Specific Performance.* Specific performance is not a matter of right, but of grace, and a court of equity will not be swift to enforce specific performance of a contract that has been allowed to expire by lapse of time and that has been defaulted and forfeited.

7. *Specific Performance—Mutuality.* An action for specific performance of a contract for the construction of an irrigation system cannot be maintained unless plaintiff could be compelled in a court of equity at suit of the defendant, to perform it on his part. The remedy must be mutual.

8. IRRIGATION DISTRICTS—*Action by Tax Payer.* In the absence of fraud, a taxpayer of an irrigation district has no capacity to bring an action for the district against the will, discretion and judgment of the district board in whom is vested by statute the power and authority to exercise such judgment.

Discretion exercised by the proper authorities, unless abused, cannot be reviewed by the courts at the instance of a taxpayer.

*Error to the District Court of Adams County, Hon. Harry S. Class, Judge.*

IN No. 9360.

Mr. L. F. TWITCHELL, Messrs. GOUDY & GOUDY, Mr. J. H. BURKHARDT, Mr. PAUL M. CLARK, for plaintiffs in error.

Mr. CHARLES F. TEW, Messrs. BARDWELL, HECOX, MC-COMB & STRONG, Mr. PERRY D. ROSE, for defendants in error.

Messrs. MELVILLE & MELVILLE, Mr. H. L. SHATTUCK, Miss E. M. WALTON, for East Denver Municipal Irrigation District.

Mr. C. H. PIERCE, for intervenors.

Mr. F. W. SANBORN, *Amicus Curiæ.*

IN No. 9363.

Mr. CHARLES F. TEW, Messrs. BARDWELL, HECOX, MC-COMB & STRONG, for plaintiffs in error.

Mr. L. F. TWITCHELL, Messrs. GOUDY & GOUDY, Mr. J. H. BURKHARDT, Mr. PAUL M. CLARK, for defendants in error.

Messrs. MELVILLE & MELVILLE, Mr. H. L. SHATTUCK, Miss E. M. WALTON, for East Denver Municipal Irrigation District.

Mr. C. H. PIERCE, for intervenors.

Mr. JAMES A. MARSH, Mr. NORTON MONTGOMERY, Mr. S. W. SANBORN, *Amici Curiæ.*

*En banc.*

MR. CHIEF JUSTICE GARRIGUES delivered the opinion of the court.

THIS case contains probably the longest record ever brought to this court. There were 165 days spent in the trial, 80 witnesses were examined and 385 exhibits introduced in evidence. The record contains 40,000 folios of typewritten matter. The printed abstract contains 16,294 pages and there are 1,428 printed pages of brief and argument.

In 1879 the Platte Land Company, Ltd., called the English Company, for the purpose of irrigating a large body of land it owned near Denver, constructed the Highline canal at a cost of $644,000, which is about 83 miles long, and covers over 100,000 acres. It caused to be organized a holding company called The Northern Colorado Irrigation Company, which held the title to the canal and water privilege, and the Platte Land Company held and owned its stock. In the general ditch adjudication in 1884 the canal was decreed a direct appropriation from the river for 1,184 cubic feet per second for irrigation, with a priority as of January 18, 1879. The company which owned and managed the canal sold to consumers water rights for about 30,000 acres which of course were confined to the river flow, and in low stages not always obtainable to the full amount, and sometimes not any on account of ditches with senior priorities demanding and taking all the water. At the time of the trial there were outstanding and in force ditch rights for about 25,000 acres. In 1891 one Cyrus Richardson filed upon and began the construction of the Antero reservoir in Park county for the purpose of supplementing the ditch rights. Soon thereafter he conveyed his reservoir

holdings to a corporation called the Highline Reservoir Company, of which he was president and general manager. October 3, 1907, after about $50,000 had been spent on the project, the Antero and Lost Park Reservoir Company, plaintiff in error, defendant below, purchased the site for $75,000, and after making additional and amended filings completed the reservoir at great expense, so that in 1909 the dam embankment had been constructed to a height of 46 feet, the dam was 4,150 feet long, faced with concrete, and the reservoir at its 33 ft. contour line had an estimated storage capacity of 71,000 acre feet and at its 36 ft. contour line had an estimated storage capacity of 85,600 acre feet, 300 acre feet of which had been reserved to Mrs. Richardson. While it was the intention and purpose of the company to store water in the reservoir for irrigation and domestic purposes generally, it expected to be able to sell storage capacity under a form of reservoir contract, and naturally the promoters supposed the principal market for such contracts would be with land owners under the Highline canal. (For a more detailed statement, see *Antero and Lost Park Reservoir Co. v. Ohler,* 176 Pac. 287, 65 Colo. 161.) For this reason the company desired to own and operate the Highline in connection with the reservoir. February 1, 1909 a contract of purchase was entered into whereby the reservoir company acquired the Highline, and 10,800 acres of land from the Platte Land Company, of which 8,000 acres were under and 2,800 above the line of the canal, and 3,580 acres lay within what afterwards became the exterior boundaries of the East Denver Municipal Irrigation District, defendant in error. The purchase price was $600,000 with interest on deferred payments which were to be made from a period extending from April 1, 1909 to July 1, 1913. The canal was conveyed by transferring the entire capital stock of The Northern Colorado Irrigation Company, as representing the ownership of the canal, which was placed in escrow and turned over to the reservoir company upon final payment of the purchase price, and as payments for the land were made deeds

were executed to the reservoir company, and it took immediate possession of the canal. The contract of purchase, among other things, contained the following clauses:

"No irrigation district shall be organized by or through the efforts or influence of the second party that shall include any of the lands covered by this contract, unless such lands shall have first been paid for in full under the terms and conditions of this contract, and deeds issued therefor by the first party to the second party.

"No incumbrance shall be placed on any of the lands or water rights described in Schedule 'A' until the same shall have been deeded to the second party, nor shall anything be done by the second party while in the management, operation and control of the said Highline canal or in connection therewith which shall change the status of the present conditions, except in the matter of selling perpetual reservoir water rights to owners of water rights in the said Highline canal as hereinafter provided, nor shall the party of the second part sell or contract to sell in the name or by the authority of The Northern Colorado Irrigation Company any new or additional water rights, but each and all of said matters shall remain as they now are until all of the lands covered by this contract shall have been paid for in full to the first party under the terms and conditions thereof.

"The second party may sell perpetual water rights in its reservoirs to owners of water rights in the said Highline canal, which may be in good standing, but to no other persons, until final payment has been made on this contract, and may contract for the carriage of said water through the said Highline canal at such times as there shall be room in said canal to carry said reservoir water; that is to say, at such times as the reasonable and safe capacity of the said canal shall not be needed to carry the water to which the owners of water rights in said canal may be entitled; provided that contracts for the running of said reservoir water in said Highline canal shall include an annual charge by the said The Northern Colorado Irrigation Company at a rate of not less than Fifty (50) cents per acre, and all such

contracts shall be subject to the approval of the first party."

After making this contract, the reservoir company sold reservoir rights to land owners under the Highline having water rights in the canal.  February 19, 1909 it entered into a contract to sell the land so purchased from the English Company to Annis &. Simonson, land agents and speculators, upon the same terms by which it had purchased it from the Platte Land Company to which it attached reservoir rights for 8,000 acres, amounting to 8,000 acre-feet, represented by reservoir contracts similar to those sold to holders of ditch rights.  The total amount of storage capacity sold, including rights sold for the land purchased from the English Company, was about 11,000 acre-feet under a form of contract, which, among other things, provided:

"The said party of the first part hereby agrees to sell unto the said party of the second part, and the said party of the second part hereby agrees to buy, a water right for ......acres in the reservoir of said company, known as the Antero Reservoir; a......acre water right being such proportionate part of the whole capacity of the said reservoir as......acre feet bears to the entire available capacity in acre feet of said reservoir, being the *pro rata* share of the total contents of said reservoir; for example: 80 one hundred-acre water rights require a completed storage capacity of 8,000 acre feet, and so on, in the same proportion for each additional water right sold until said reservoir is completed to a maximum capacity, as determined by a contour one foot survey made under the supervision of the State Engineer, of approximately 85,000 acre feet, so that all 100-acre water rights sold will be of equal status and of the measure of, as an illustration, and taking 85,000 acre feet as said maximum capacity, 1/850th part of the completed and available capacity of said reservoir.  The water stored in said reservoir shall be distributed *pro rata*, not only once in each year, but as many times as the reservoir can be filled, or partially filled by the use of reasonable diligence during the year.

"Fourth.  It is distinctly agreed by and between the

party of the first part and the party of the second part, that if through unavoidable accident said reservoir shall in any season be unable to receive or hold in storage a quantity of water equal to its then existing capacity to store water, or if through unforeseen and unavoidable accident, any of the structures connected with said reservoir shall be unable to carry and deliver the same at the time required, said company shall not be liable for any damages thereby accruing to the party of the second part, or assigns. The said reservoir company agrees to use reasonable diligence to fill the said reservoir from its appropriations of water now or hereafter made for that purpose, and in case said appropriations fail to fill the same in any year through drouth, shortage of water supply, or any other reason beyond the control of the company, said company shall not be liable in any way for such deficiency of water in said reservoir.

"Fifth. It is further expressly understood and agreed that the party of the first part agrees to construct and will construct and complete said reservoir and all inlet and outlet ditches and other works to a capacity necessary to safely store one acre-foot of water for each acre of water rights sold and outstanding, and it is agreed that when the entire capacity of said reservoir has been exhausted by the sale of water rights fully paid up, or sooner, at its option, and at all events on or before January 1st, 1915, the party of the first part shall turn over the entire Antero Reservoir and its appurtenances and the full management thereof to a company to be organized by said subscribers, the said reservoir, inlet and outlet ditches, and water rights, with their appropriations and appurtenances, to be then free and clear of all liens and incumbrances whatsoever, and all of said works to then be in good repair and condition, subject nevertheless, at all times, to the burden and easement therein of all the water rights sold as aforesaid, the stock of said company to be issued to the subscribers *pro rata* on the water rights held by them respectively, and the party of the first part agrees to take stock for the then unsold

water rights of any *pro rata*. And it is further expressly understood and agreed by and between the parties hereto, that it is the intention of said first party to complete its dam to said Antero Reservoir, to a height of 46 feet after settlement thereof, at the highest point, and approximately four thousand feet in length, and that the said dam is to be ten feet higher, after settlement, then the high water line of said reservoir, leaving a margin for safety of ten feet from the top of the water to the crest of the dam, so that the ultimate capacity of said reservoir, when completed, will be as ascertained by said contour survey, taking 36 feet as the high water line, and that said second party enters into this contract on this understanding."

Paragraph 6 provides that upon final payment the title to the water right shall, subject to the terms and conditions therein contained, vest fully in the purchaser without further deed or conveyance.

In 1909 settlers beyond the terminus of the Highline sought to bring their lands (about 60,000 acres) under irrigation by extending the canal and forming an irrigation district under the extension. Their notion was to organize such a district to construct the extension and necessary laterals, purchase the Antero reservoir and Highline canal, enlarge the latter, and construct necessary plains reservoirs within the district to be used as equalizing and distributing reservoirs. To accomplish this purpose, persons interested in the proposed extension ditch and irrigation district organized a promotion company in February, 1909, called the Antero Land and Irrigation Company, defendant in error, the members of which company were instrumental in causing to be organized the East Denver Municipal Irrigation District. This district was declared duly organized November 22, 1909, and the moving spirits in the promotion company and in the irrigation district were persons having land holdings under the extension. To be in a position to effect the object undertaken, the promotion company, in May, 1909, entered into an optional contract

with the reservoir company to purchase the Antero reservoir and Highline canal for $1,500,000 in money, payable $1,000,000 in cash on or before 18 months and $500,000 in cash on or before 30 months from that date. Its ability to pay this sum for the property depended upon its ability to construct and turn over the entire system completed to the irrigation district and to market $3,000,000 in irrigation district bonds which was the consideration the district was to pay the promotion company for the completed system.

August 30, 1910, the district entered into a contract with the promotion company by which the latter agreed in substance to acquire and construct an entire and complete irrigation system, according to certain plans and specifications attached to the contract, comprising the Antero reservoir and Highline canal; to enlarge and extend the canal, and to construct 7 distributing laterals and 3 reservoirs specifically mentioned in the contract as the Abbott, the Terminal and the Irondale, so as to cover the 60,000 acres of land included in the proposed district; and to complete certain work on the Antero reservoir. The plans and specifications for the system necessary to furnish the district with water had been prepared by an eminent irrigation engineer of Northern Colorado by the name of E. E. Baker who had been employed by the promotion company to make a complete survey of the proposed irrigating system. The entire system was to be completed and turned over to the district by the promotion company by June 1, 1913, for which it agreed to pay the latter $3,000,000 in irrigation district bonds. The Abbott reservoir was to be constructed with an estimated capacity of 9,000 acre feet and the Terminal with an estimated capacity of 4,000 acre feet. The contract, among other things, provided:

"The company (the promotion company) shall commence the completion of the irrigation system herein provided for and agreed to be conveyed, within 30 days after the confirmation of the bond-issue as aforesaid, and shall complete the Terminal reservoir to the actual storage capacity above the floor of the outlet conduit of 2,500 acre feet by Janu-

ary 1st, 1912, and shall complete same to an actual storage capacity of 4,000 acre feet as hereinbefore set out by January 1, 1913, and shall complete the main Highline canal extension by June 1, 1911, and the repairs and enlargements of the old Highline canal by April 1, 1912, and shall complete the Antero reservoir to said storage capacity of 71,000 acre feet by March 1, 1911, this latter to include the facing of the Antero reservoir dam, and the entire system shall be completed in a thorough and workmanlike manner and turned over to the district in working order substantial and permanent in character, according to the specifications, not later than June 1, 1913."

Had this contract been performed the district would have become the owner of a completed irrigation system subject to sharing the water stored in the reservoir *pro rata* with 12,000 acre-feet rights reserved, and sharing the capacity of the canal as enlarged with the owners of approximately 29,000 acres of Highline water rights. The district, by a vote of the people, ratified and approved this contract and authorized the issuance of the bonds, and January 24, 1912, the organization of the district and the validity of the bonds were confirmed by a decree of the district court. August 29, 1912 this contract was modified by a supplemental agreement, ratified by a vote of the people, which provided that, upon the delivery to the district of proper deeds conveying certain rights of way, and also deeds conveying to the district the filings of the Irondale, Abbott and Terminal reservoirs, the district would deliver to the promotion company $250,000 of the bonds. It further provided that the promotion company, within 30 days after receipt of the bonds would commence the enlargement of the Highline, and the construction of the extension and the system of laterals, and time for the completion and conveyance of the entire irrigation system as a whole was extended to January 1, 1914. This supplemental contract provides, among other things:

"The time for the completion and conveyance of the entire irrigation system, according to the terms of the orig-

inal contract, is hereby extended to January 1, 1914, and
may be further extended as provided in the original con-
tract between the district and the company, to which con-
tract this contract is supplementary."

It was expected that, having this further agreement, the
promotion company would comply with its contract with
the district, complete the system, and take up its option
with the reservoir company, but it soon became apparent
that such was not the case. In October, 1912 it began
conversations with one Lucas, defendant in error, first to
borrow money to complete the system, and later, when it
found this could not be arranged, to sell and assign to him
its contract with the district. But Lucas refused to pur-
chase the district contract from the promotion company
unless he could make a more favorable contract with the
reservoir company than the promotion company had for
the purchase of the property, and began negotiating inde-
pendently with the reservoir company for a new contract,
having in the meanwhile an arrangement with the promo-
tion company that if he secured a contract satisfactory to
himself with the reservoir company, he then would nego-
tiate with the promotion company for the purchase of its
contract with the district. December 14, 1912, Lucas was
successful in making and entering into an independent con-
tract with the reservoir company whereby the latter
agreed to sell to him, and he agreed to purchase, the res-
ervoir and Highline for the sum of $1,250,000, $1,000,000
thereof to be paid in district irrigation bonds instead of
cash when he completed the system and it was accepted and
turned over to the district according to the promotion com-
pany's contracts with the district, and the remainder in
cash, $50,000 on or before January 15, 1913, and $200,000
on or before January 15, 1915, deeds and conveyances of
title to be placed in escrow and delivered to the district
upon the completion of the system in accordance with the
August 30, 1910 contract as supplemented August 29, 1912.
The promotion company was then in default in its contract
with the reservoir company, and the latter's contract with

Lucas was made upon the basis of the sale and assignment by the promotion company of its district contracts to Lucas, the assumption of the obligations by Lucas of the district contracts with the promotion company, and the completion by Lucas of the system in accordance with the terms, obligations, plans and specifications of those contracts. Paragraph 5 of the contract provides:

"It is understood by the parties hereto that this contract contemplates a conveyance to the irrigation district of the Antero reservoir, together with its franchises, rights, privileges, water rights and appropriations, free and clear of all incumbrances or indebtedness, subject to the vested rights of the consumers of water therefrom aggregating 12,000 acres and evidenced by reservoir right contracts which contracts the irrigation district assumes and agrees to carry out and fulfill, and that the Highline canal shall be conveyed by the delivery of the entire capital stock of The Northern Colorado Irrigation Company, and the said canal is taken subject to the vested rights of the consumers of water therefrom, aggregating 30,000 acres, more or less, evidenced by water contracts and deeds, which obligations, the irrigation district likewise assumes and agrees to carry out."

Lucas' contract with the reservoir company did not call for certain work, it called for the completion and turning over to the district of a completed system under the statute, constructed according to certain plans and specifications (including the Abbott and Terminal reservoirs) for which the reservoir company agreed to take $1,000,000 in bonds in part payment.

December 30, 1912, after extended negotiations, Lucas entered into a writing with the promotion company by which he took an assignment of its August 30, 1910 contract with the district whereby he agreed to construct, complete and turn over the system in accordance with that contract, plans and specifications. The reservoir company then placed deeds and evidences of title in escrow to be delivered upon the system being completed by Lucas accord-

ing to the terms of the August 30, 1910 contract and turned over to and accepted by the district, and the payment of the purchase price.

The promotion company, before the assignment of this contract, had completed and turned over to the Irondale reservoir, and done a little work on laterals A and B, for which it had been allowed on estimate $49,000 in bonds.

Lucas wanted different plans and specifications, and wanted to eliminate the Abbott and Terminal reservoirs, so February 3, 1913 he induced the board of directors to change the August 30, 1910 contract. February 1, 1913 he succeeded in getting the board to adopt a resolution authorizing the president and secretary to sign with him what is known as the February 3, 1913 contract. This modified and changed the August 30, 1910 contract by eliminating the Abbott and Terminal reservoirs, and substituted other plans and specifications to be made by his engineer and the engineer of the district for those made by E. E. Baker, attached to the original contract. This February 3, 1913 contract was never ratified by a vote of the people. On the contrary, when it was later submitted for ratification, it was defeated. Lucas was active in the construction of the work until in June, 1913 when it is claimed he suspended work, and from that time on either abandoned the work entirely or did no work of any substantial character upon the system. August 25, 1913, because he had quit work, the board of directors of the district notified him of their dissatisfaction because he was making no progress with the work, and that they knew of no reason why there should be an extension beyond January 1, 1914. The reason for Lucas quitting work in June, 1913 seems to have been because he was without money to complete the system.

October 16, 1913, when the work was at a standstill, and apparently abandoned, the reservoir company sent Lucas the following letter:

"*   *   * We are informed that you have arranged, or are attempting to arrange with the District to forego the construction of the Terminal and Abbott reservoirs pro-

vided for in said contract of August 30, 1910, and have made, or expect to make, other material changes in the specifications of the proposed system, including the construction of a main canal of less capacity than specified in said contract, thus materially changing and diminishing the irrigation system agreed by you to be constructed and materially affecting the value of the district bonds to be taken by us.

Our people regard the construction and completion of the Terminal and Abbott reservoirs as a very important factor in the Irrigation District's system, and in fact necessary to furnish the lands in the District an adequate water supply for irrigation.

In accordance with instructions from our Board of Directors, you are hereby notified that our Company will insist upon the completion of the entire irrigation system proposed for said District as provided for and described in the contract of August 30, 1910, according to the terms and conditions of that contract and any modifications thereof made by the supplemental contract between the District and The Antero Land and Irrigation Company of date, August 29, 1912."

He paid no attention to this letter and treated it as an ouster and repudiation of his December 14, 1912 contract with the reservoir company, and as an excuse from doing further work.   January 19, 1914, the reservoir company sent him the following letter:

"Since July last, you have done no work of a substantial character on the Irrigation system for The East Denver Municipal Irrigation District and have failed to complete and convey same according to contract by January 1, 1914. In addition to these facts you have eliminated two important reservoirs from the system which you agreed to build in your contract with our Company.

We notified you on October 16, 1913, that we would not accept the system until you fulfilled your contract fully and completely.   Notwithstanding the notice, you have failed to reply or to communicate with us in reference thereto.

We are now entitled, so we are advised, to cancel your contract, if we so desire, and if necessary to protect our interests we will do so. Unless we receive some satisfactory communication from you by February 9th, 1914, we shall take such steps as we may be advised."

He failed to proceed with the work, or to pay any attention to these letters, and March 18, 1914, the reservoir company sent the following letter:

"This Company advised you on or about October 16th, 1913, that you had broken your contract with said Company by eliminating from the irrigation system proposed for The East Denver Municipal Irrigation District, the Abbott and Terminal reservoirs, and by making other changes in said system without said Company's consent and approval; and further advised you on or about January 19th, 1914, that you had committed further breach of your contract with this company by failing to complete the irrigation system, which, in your contract with this company, you undertook to complete by January 1st, 1914.

You failed to reply or pay any attention to either of these notices, and we are forced to the conclusion and now take the position, that you have renounced your obligations to this Company and terminated, by your own action, your contractual relations with The Antero and Lost Park Reservoir Company. You are therefore notified not to trespass upon, or in any way interfere with, for any purpose whatever, the High Line Canal or the Antero reservoir, or any of the properties of this Company."

The August 30, 1910 contract provided for an extension of time but Lucas never asked for any extension and was never given any, and April 11, 1914 the board of directors claimed he was in default and had abandoned the work, and passed a resolution declaring the August 30, 1910 contract assigned by the promotion company to Lucas terminated and gave Lucas notice thereof.

October 2, 1915, the ratification or rejection of the February 3, 1913 contract, and the question as to whether the August 30, 1910 contract and the August 29, 1912

amendment thereto should be declared defaulted and forfeited, was submitted to the voters of the district, and upon such vote being taken, a majority of the voters repudiated the action of the directors of February 3, 1913 and declared the district contracts of August 30, 1910 and August 29, 1912 defaulted and forfeited.

August 31, 1915, the reservoir company entered into a contract with the city and county of Denver, through the Public Utilities Commission, to sell to the city its interest in the Highline and the reservoir for $1,050,000, subject to all outstanding water rights, and at the same time the reservoir company conveyed the reservoir by warranty deed to the city, which was placed upon record.

January 15, 1916, seven or eight land owners and taxpayers in the district began this action to enforce specific performance of the contract. The reservoir company, the promotion company, the irrigation district, the city of Denver and Lucas were made defendants, and all except Lucas resisted the action. He aligned himself with plaintiffs and in fact was the principal factor in bringing and carrying on the litigation.

Intervenors owning in the aggregate about 100 reservoir water rights and less than 1% of the outstanding rights filed a petition in intervention, claiming that the reservoir rights conveyed and agreed to furnish a specific amount of water instead of storage capacity in the reservoir; that the normal amount it can furnish each year from storage does not exceed the outstanding 11,000 acre-feet rights sold; that its capacity to furnish water is limited to the amount it can actually deliver each year; that when the company sold rights equal to its ability to furnish water each year it exhausted its capacity and it would be contrary to public policy for it to sell additional reservoir rights; that under the 5th paragraph of the contract the reservoir right holders were vested with the title of the reservoir on January 1, 1915; that the outstanding rights then sold exceeded its capacity to supply water each year; that there were no remaining rights in the reservoir; that the entire reservoir

and all its rights belonged to the outstanding reservoir right holders on January 1, 1915 and that the deed made to the city conveyed nothing because the company had nothing to sell.

The district claims Lucas failed to carry out the August 30, 1910 contract it made with the promotion company, quit work and was in default; that the February 3, 1913 contract was illegal and that it did not desire to go forward or purchase the system, and that it was under no obligation to proceed further with Lucas; that to enforce specific performance would be detrimental to the district; that it would be better off without the system, with a charge of $12.50 an acre upon the land, than it would be to take the system and add an additional charge of $37.50 per acre; that the district and its board of directors had the right to exercise the discretion and determine whether it would seek specific performance or would treat the contract as terminated by reason of the default; that plaintiffs could not exercise the power and discretion delegated to the district; that plaintiffs had no right or capacity to prosecute the action for specific performance; that the value of the system contracted for had been destroyed by the elimination of the distributing reservoirs and failure to enlarge the Highline; that the system was not sufficient or adequate for the district; that Lucas quit work and made default in the performance of the contract, and that the attempted modification destroyed its usefulness to the district.

The reservoir company claims that plaintiffs have no capacity to maintain the action; that its contract relations were with Lucas; that he was to complete and deliver to the district the system contracted for in the August 30, 1910 contract which included the construction of the distributing reservoirs, the enlargement of the Highline so it would carry 600 second feet for delivery to the head of the extension for the district in addition to the water which would be necessary for the Highline to carry under its contract rights to other users; that Lucas had refused to construct the distributing reservoirs; had refused to enlarge the

Highline; had quit work and refused to carry out the contract of August 30, 1910; that until the system was completed in accordance with the plans and specifications of the August 30, 1910 contract it was under no obligation to accept the $1,000,000 in bonds; that the elimination of the portion of the system which Lucas refused to construct would render the bonds practically worthless; that Lucas had defaulted in his contract with the district in that he had refused to enlarge the Highline as specified, refused to do the work upon the Antero dam which he had agreed to do, and refused to construct the distributing reservoirs, and had failed to complete the system within the time specified in the district contracts, and had quit, abandoned and refused to go forward with the work; that the reservoir company had given him notice of all these matters to which he paid no attention; that as he had failed to proceed with the work for a period of about two years the reservoir company was released from any obligations under its contract with him, and, after such release, had made a sale of its interest in the property to the city and county of Denver; that no specific performance can be decreed by the court of the district contracts; that the contracts were defaulted and abandoned by Lucas; that the contracts had expired by their own limitation. As to the reservoir rights, it claims that these rights do not sell or contract to deliver any certain amount of water; that they only sell storage capacity in the reservoir; that under each reservoir right the owner thereof is entitled to such portion of water stored in the reservoir as his right bears to the entire capacity of the reservoir. As to the 5th clause, it claims that the title to the reservoir on January 1, 1915 did not vest in the reservoir right holders; that before they could take over and operate the reservoir they must of necessity from the conditions of the contract organize a proper corporation or company to take the title.

The city and county of Denver claims the same matters claimed by the reservoir company, and also that it purchased the Antero and Highline in good faith and acted

within its powers in making such purchase; that it made the purchase for the needs and benefits of the city and its citizens after Lucas had defaulted in the August 30, 1910 contract and after the district had declared that it would not complete the purchase of the Lucas system, and that the city was entitled to hold such property under its purchase.

Upon final hearing the court refused to give Lucas or plaintiffs any equitable relief and found neither plaintiffs nor Lucas could enforce specific performance of the contracts, that the attempted February 3, 1913 contract between Lucas and the directors was invalid; but found that intervenors were entitled to maintain their intervention; that the reservoir vested in the reservoir right holders January 1, 1915, and that such reservoir right holders were entitled to have a transfer of the reservoir to a corporation to be thereafter organized under the direction of a receiver to be appointed by the court; that the reservoir water right contracts were to furnish water annually therefrom, instead of calling for capacity in the reservoir; that the ability of the reservoir to furnish water annually was limited to 15,000 acre-feet; that intervenors were entitled to have a receiver appointed not only for the reservoir but for the Highline canal and the reservoir company; that the receiver should take over and operate the reservoir and Highline canal and repair and better the reservoir dam; deliver water from both structures and collect rentals and assessments; proceed to organize a corporation on behalf of the reservoir right holders; distribute the stock of such company among such right holders, and require the reservoir company to convey the reservoir to the corporation to be organized under the receivership, and directed the receiver to take over the books, records and papers of the reservoir company and exercise such other powers as might be conferred by the court, and entered decree accordingly.

The reservoir company, the irrigation district and the city prosecute the writ of error in case 9360 to secure a reversal of the decree in favor of intervenors. Lucas and

plaintiffs below prosecute the writ of error in case 9363 to secure a reversal of the decree denying them specific performance of the contract and refusing to grant them any equitable relief.

GARRIGUES, C. J., after stating the case as above, delivered the opinion of the court:

1. The court found that the reservoir water right contracts contained words and phrases of doubtful meaning which made them ambiguous, and considered a vast amount of extraneous evidence as to their meaning, also as to the rainfall, run-off and drainage-area, and construed them to mean sales of a definite supply or quantity of water not to. exceed a maximum of 1 acre-foot per acre as distinguished from storage capacity; that intervenors were to receive under the contract 1 acre-foot per acre each year out of the reservoir, and that to hold otherwise would make the contracts against public policy. It further found that, in average years, only 15,000 acre-feet were available for storage from the normal flow, and that this was its capacity to store and furnish water; that the contract holders became *ipso facto* the owners of the reservoir January 1, 1915, without any conveyance by virtue of paragraph 5 of the contract, and ordered that the reservoir should be transferred to a mutual company limited to 15,000 shares or acre-feet rights to be organized and operated under the direction and management of a receiver, and that stock should issue to owners of the outstanding 11,000 acre-feet rights plus 4,000 more to go somewhere not stated in the decree.

2. Are the contracts ambiguous? Intervenors' reservoir water-right contracts are before us for proper interpretation unhampered by any interpretation placed thereon by the lower court, and we are called upon first to determine their meaning, force and effect. There is no evidence of mutual mistake, fraud or misrepresentation by the reservoir company regarding the amount of water to be received thereon each year. They describe in certain and unam-

biguous terms what is conveyed thereby, no one was or could have been deceived by the language employed, and evidence was not admissible to vary or change their terms. To put the construction placed thereon by the court makes an entirely new and different instrument than that made by the parties themselves. There is no need of any coloring background to construe or understand them, and the intention of the parties as expressed in the contract is controlling.

The court failed to state any word, phrase, clause or paragraph whose meaning was not clear and unambiguous. If it had found any ambiguity, it surely would have specifically pointed it out. Ambiguity is a question of law. The different contentions of the parties are not evidence of ambiguity. We apprehend the question did not arise from any trouble in understanding the language of the contract, but from erroneously assuming that the contracts were against public policy. If there is any such public policy as announced by the court, the contracts being clear in their meaning cannot be harmonized with it by construction, and are void.

The contract provides in unmistakable terms that the reservoir is to be constructed of a sufficient capacity to safely store in depth 36 ft. of water above the base of the outlet tube, and that intervenors acquire a right to share upon a *pro rata* basis in the capacity of the reservoir in acre-feet as such capacity becomes available until the dam reaches a height of 46 feet after settlement, the dam then to be 10 feet higher after settlement than the high water line, being a contour survey of the high water line when water is stored therein to a depth of 36 feet, giving an estimated storage capacity of 85,600 acre-feet. The limit of the right per acre is an acre-foot which is the unit of measurement and basis for a fractional pro rating to the extent that a consumer's rights in acre feet bear to the estimated capacity of the reservoir in acre feet when completed to the size, extent and capacity specifically named in the contract. The rights are based upon storage capacity and not upon the average amount of water annually available, nor-

mally, for storage in the reservoir. The court will take judicial notice that the flow of water in the mountain streams fluctuates from scarcity to abundance at times for all the reservoirs. Undoubtedly there will be dry and wet years, and in wet years, when the water is not needed, it will remain in the reservoir until it is needed, but whether wet or dry, or in years of scarcity or plenty, the right-holders are obligated under their contracts to share the water *pro rata.* The reservoir was, or is to be if it is not, constructed on this plan to an estimated capacity when completed of 85,600 acre-feet for the purpose of catching and storing all the available winter water, flood waters, abnormal flow, in short, any and all water it can get not needed at the time for direct irrigation, and the contract provides that the company shall use reasonable diligence in the filling of the reservoir. It has always been the policy of the state to encourage the construction of reservoirs of sufficient capacity to impound not only the normal flow but the entire flow during the high water stages in whatever quantity it might come, for future use in this state. No one would construct a reservoir to a capacity of 85,600 acre-feet to store only a normal average flow annually of 15,000 acre-feet.

The water right sold is a right based upon fractional storage capacity coupled with *pro rata* distribution and an ownership in the right, and is a right to use such proportional part of the water as might be stored with an agreement upon the part of the company to use reasonable diligence in filling the reservoir and upon the part of the users, to pro rate the water actually stored up to the 36 ft. contour line, whether the consumers are early or late. The contract nowhere provides that they are to receive an acre-foot of water per acre each year out of the reservoir. We, therefore, find as a matter of law that the contracts are not ambiguous and that the court should have kept within the terms thereof for the purpose of ascertaining their meaning, and that they are to be construed as other contracts according to the intention of the parties, as ex-

pressed in the contract. *Wright v. Platte Valley Irri. Co.,*
27 Colo. 322, 61 Pac. 603; *Hackett v. Larimer & Weld Res.
Co.,* 48 Colo. 178, 109 Pac. 965; *Denver v. Brown,* 56 Colo.
216, 138 Pac. 44; *Idaho Fruit Land Co. v. G. W. Beet Sugar
Co.,* 18 Idaho 1, 107 Pac. 989.

3.    Are the contracts against public policy?    As stated
in the last paragraph, these contracts are to be construed
like other contracts according to the intention of the par-
ties as expressed in the contracts.    A contract with a res-
ervoir company constructing a storage reservoir for the
sale of water rights therein upon a status of equality based
upon its capacity to store, with a clause enjoining diligent
effort to conserve all the available flow and absolving the
company from liability if less than the maximum capacity
is obtained, encourages the construction of reservoirs and
is not against, but is in conformity with, public policy.
Intervenors' contract violates no statute, and is not against
public policy, neither is it contrary to good morals.    There
is no public policy against selling a right to use a portion of
the water stored each year in a reservoir, based on the
storage capacity of the reservoir coupled with an owner-
ship in the right, or to contract for the disposition of such
storage capacity.

"Public policy requires that men of full age and compe-
tent understanding shall have the utmost liberty of con-
tracting, and that their contracts when entered into freely
and voluntarily shall be held sacred and enforced by the
courts."

4.    Did title to the reservoir and its management pass
January 1, 1915 *ipso facto* under paragraph 5 of the con-
tract to the outstanding contract holders without a convey-
ance and without the organization of a mutual company to
receive, manage and operate the same, and issue stock rep-
resenting rights in the reservoir?

There is no agreement in the contract that the property
shall pass *ipso facto* to the water contract holders immedi-
ately on January 1, 1915.    The agreement is to turn it over
to a mutual company to be formed by them in which the

reservoir company will be entitled to stock representing its interest in the unsold water rights. No such a company was or has been formed, there is no evidence that a majority of the contract holders desire to form such a company. Until such company is organized and ready to issue stock, and take the title and assume the burden and responsibility of maintaining and operating the reservoir, there is no obligation to convey it or to release control in the management and operation thereof. It may be that a majority does not care at this time to form such a company and take over the property but prefer that the management and expense of maintenance and operation should remain with the reservoir company until such time as they desire to take it over. Before changing to such a mutual company all the expense of maintenance, superintendence, operation and repairs are borne by the reservoir company; after the change such expenses will have to be borne by an assessment upon the stockholders as provided by the statute, and by-laws of their company. Intervenors represent less than 100 acre-feet of the 11,000 acre-feet of reservoir rights sold or outstanding, being less than 1 % of such reservoir right holders, and a large majority of the remaining reservoir right holders gave evidence that they did not then desire to form a corporation or take over the reservoir, but preferred its maintenance and operation remain with the reservoir company until such future time as a majority of the reservoir right holders desired, through a corporation, to assume such burden. No doubt the contract holders are entitled to have the reservoir constructed to the size and of the capacity named, and if they desire to have it turned over to a mutual company as stipulated, in which all the reservoir rights outstanding and the unsold interest whether owned by the company or the city will be entitled to be evidenced by stock, and stand upon a basis of equality. When this is accomplished all the 85,600 rights, if that is the number, will be entitled to be evidenced by shares of stock, and the company, or its assigns, will be entitled to stock representing the remaining interest not held by con-

tracts. Though this interest belonging to the reservoir company cannot be represented by stock until the stock is issued, still such interest would represent the company's ownership of unsold water rights remaining in the reservoir, and this is a property right or interest which the company can dispose of in bulk as well as by individual sales. If the city is the owner of this right, it stands in the shoes or place of the reservoir company as to such interest, and would be entitled to the stock representing these rights in the place of the reservoir company. Whether the legal title to the reservoir remains in the reservoir company or rests in the city, or is placed in a mutual company to be formed as stipulated, the rights of intervenors under their contracts can be no more than the right to use, on a *pro rata* basis, whatever water may be stored in the reservoir according to the terms of their contracts.

5. Did the court correctly rule that the February 3, 1913 contract was void?

The district agreed by vote of the people to purchase from the promotion company an entire and completed irrigation system under Sec. 11 of the irrigation district act of 1909 according to certain plans and specifications prepared by E. E. Baker, attached to and made a part of its contract with the promotion company. This was the only system ever authorized to be purchased by a vote of the electors. It was in consideration of Lucas completing and delivering this system, and its acceptance by the district, that the reservoir company agreed to take $250,000 in money and $1,000,000 in bonds as the purchase price. Although he agreed with the reservoir company to do so in his contract of December 14, 1912, Lucas did not want to construct the system according to the plans and specifications attached to the August 30, 1910 contract and wanted to eliminate the Abbott and Terminal reservoirs, so, proceeding without authority, he induced the directors of the district to enter into the February 3, 1913 contract, in which the system adopted by a vote of the people was changed by the directors in many important particulars. Under the system voted

by the people the Highline was to be enlarged to an additional carrying capacity of 600 cubic feet per second to the district. The district claims this means 600 sec. ft. into the intake of the extension in addition to the river rights entitled to be carried in the Highline. This was changed to 500 second feet. The contract attempts to relieve Lucas from any and all obligation to complete or construct the Abbott and Terminal reservoirs which would depreciate the value of the $1,000,000 in bonds. The evidence showed that these reservoirs were a necessity, but the contract recited a false statement that the district would be best subserved by omitting these reservoirs, when in fact Lucas induced the directors to omit them because it would be to his financial advantage, though disastrous to the district. The original contract contains no provision authorizing the contractor to eliminate these reservoirs at his option for which the district might retain $325,000 in bonds. It contains a clause that if the promotion company fails to complete these reservoirs according to the plans and specifications attached, it shall be liable in damages on its bond and that not less than the estimated amount specified in the contract, viz. $325,000 in bonds, shall be retained by the district along with the 15% to be retained on the work done on such reservoirs, clearly showing that it was not the intention that the contractor might omit them at his pleasure. The canal with the extension is over 100 miles long and the Antero reservoir over 200 miles from the land and it takes reservoir water about a week or ten days to reach the land. It was found by the court, and is an admitted fact, that the irrigation district would on this account be a failure without reservoirs in the district to equalize the distribution of the water. The contract, plans and specifications of E. E. Baker adopted by the district call for these distributing reservoirs, and we find that the district board was without power to make a contract eliminating them. Even if it had, the reservoir company was not bound under its December 14, 1912 contract with Lucas to convey the property and accept the bonds in payment

until he completed the system in accordance with the August 30, 1910 contract. Another change attempted was that Lucas was to construct the Antero reservoir to an additional capacity of 85,600 acre-feet instead of 71,000 acre-feet for which he was to receive $39,000 in bonds for this additional work, clearly beyond the power of the directors. The plans and specifications voted upon and according to which the system was to be delivered to the district were the plans and specifications prepared by E. E. Baker attached to and made a part of the original contract. By the February 3, 1913 modification the directors and Lucas contracted that whatever plans and specifications their engineers should afterward agree upon should be the plans and specifications of the system instead of the plans and specifications prepared by E. E. Baker and voted upon by the people. In this way other plans and specifications were to govern than those attached to the original contract, the contract voted by the people could be changed, and under the modification many important changes were made which vitally affected the district. This was an attempted delegation of power to others authorizing them to materially change the system after it had been adopted by a vote of the people. The district court found that the February 3, 1913 contract was illegal, in which we concur.

This assignment to Lucas of the promotion company's district contract required no ratification by the district and was assignable without its consent. The contract simply called for a completed system and it was immaterial by whom it was completed. So, we are to be controlled in this action by the August 30, 1910 contract as it was amended by the supplemental agreement August 29, 1912 between the district and the promotion company, which was assigned to Lucas December 30, 1912, and the December 14, 1912 contract between Lucas and the reservoir company.

6. Was the court right in denying Lucas or plaintiffs specific performance of the contracts?

The contract, specific performance of which is sought, expired by lapse of time January 1, 1914, more than two

years before this suit was brought, and the district, by a vote of the people in 1915, declared it abandoned and forfeited. Specific performance is not a matter of right, but of grace, and a court of equity will not be swift to enforce specific performance of a contract that has been allowed to expire by lapse of time, and that has been defaulted and forfeited.

There is another reason; Lucas did not bring this action in his own name, but caused it to be instigated in his interest and for his benefit against the other defendants and himself, and he, though a nominal defendant, should be treated as a plaintiff prosecuting the case against the reservoir company. A suit for specific performance of this contract by the reservoir company or the district brought either jointly or severally against Lucas or plaintiffs could not be maintained. Therefore, a suit by Lucas or plaintiffs for specific performance against the reservoir company is lacking in mutuality and cannot be maintained. As a general rule a contract cannot be enforced by specific performance against one of the parties unless the remedy is mutual. This contract is incapable of enforcement in equity by the reservoir company against Lucas, therefore his suit against the reservoir company is lacking in mutuality of remedy. It is said: "contracts which by their terms stipulate for a succession of acts, whose performance cannot be consummated by one transaction, but will be continuous, and require protracted supervision and direction, with the exercise of special knowledge, skill or judgment in such oversight, are not, as a rule, specifically enforced." It is held as a rule by the weight of authority that an action for specific performance of a contract like this cannot be maintained unless plaintiff could be compelled in a court of equity at the suit of the defendant to perform it on his part. The remedy must be mutual. *Texas & St. L. Ry. Co. v. Rust,* (C. C.) 17 Fed. 275; *Strang v. Richmond P. & C. R. Co.* (C. C.) 93 Fed. 72; *Strang v. Richmond P. & C. R. Co.,* 101 Fed. 511, 41 C. C. A. 474; *Lucas v. Milliken* (C. C.) 139 Fed. 816; *Taussig v. Corbin,* 142 Fed. 660, 73 C. C. A. 656; *Shubert v. Wood-*

*ward,* 167 Fed. 47, 92 C. C. A. 509; *La Hogue Drainage Dist. No. 1 v. Watts,* 179 Fed. 690, 103 C. C. A. 236; *Pantages v. Grauman,* 191 Fed. 317, 112 C. C. A. 61; *Leonard v. Board of Directors Plum Bayou Levee Dist.,* 79 Ark. 42, 94 S. W. 922, 9 Ann. Cas. 159; *Caldwell v. Donaghey,* 108 Ark. 60, 156 S. W. 839, 45 L. R. A. (N. S.) 721, Ann. Cas. 1915B, 133; *Iron Age Pub. Co. v. Western Union Tel. Co.,* 83 Ala. 498, 3 South. 449, 3 Am. St. Rep. 758; *Electric Lighting Co. of Mobile v. Mobile & Spring Hill Ry. Co.,* 109 Ala. 190, 19 South. 721, 55 Am. St. Rep. 927; *Tombigbee Valley R. R. Co. v. Fairford Lumber Co.,* 155 Ala. 575, 47 South. 88; *Roquemore v. Mitchell Bros.,* 167 Ala. 475, 52 South. 423, 140 Am. St. Rep. 52; *Jolliffe v. Steele,* 9 Cal. App. 212, 98 Pac. 544; *Lattin v. Hazard,* 91 Cal. 87, 27 Pac. 515; *Stanton v. Singleton,* 126 Cal. 657, 59 Pac. 146, 47 L. R. A. 334; *Moore v. Tuohy,* 142 Cal. 342, 75 Pac. 896; *Los Angeles, etc., Co. v. Occidental Oil Co.,* 144 Cal. 528, 78 Pac. 25; *Pac., etc., Ry. Co. v. Campbell-Johnston,* 153 Cal. 106, 94 Pac. 623; *Chicago Mun. Gas Light Co. v. Town of Lake,* 130 Ill. 42, 22 N. E. 616; *Welty v. Jacobs,* 171 Ill. 624, 49 N. E. 723, 40 L. R. A. 98; *Gage et al. v. Cummings,* 209 Ill. 120, 70 N. E. 679; *Ulrey v. Keith,* 237 Ill. 284, 86 N. E. 696; *Launtz v. Vogt,* 133 Ill. App. 255; *Minnetonka Oil Co. v. Boyd,* 143 Ill. App. 479; *Bourget v. Monroe,* 58 Mich. 563, 25 N. W. 514; *Alworth v. Seymour,* 42 Minn. 526, 44 N. W. 1030; *Solomon v. Wilmington Sew. Co.,* 133 N. C. 144, 45 S. E. 536; *Fargo v. N. Y. & N. E. R. Co.,* 3 Misc. Rep. 205, 23 N. Y. Supp. 360; *Agens v. Koch,* 74 N. J. Eq. 528, 70 Atl. 348; *Roberts v. Braffett,* 33 Utah 51, 92 Pac. 789; *Kendall v. Frey,* 74 Wis. 26, 42 N. W. 466, 17 Am. St. Rep. 118; *Findley v. Koch,* 126 Iowa 131, 101 N. W. 766; *Wood v. Dickey,* 90 Va. 160, 17 S. E. 818; *Fowler Utilities Co. v. Gray,* 168 Ind. 1, 79 N. E. 897, 7 L. R. A. (N. S.) 726, 120 Am. St. Rep. 344; *Rutland Marble Co. v. Ripley,* 10 Wall. 339, 19 L. Ed. 955.

We are of the opinion that specific performance of the August 30, 1910 contract cannot be enforced in equity, and that the court was right in denying plaintiffs and Lucas

any equitable relief.

7. Had plaintiffs capacity to bring this action? The contract expired by limitation January 1, 1914, and some time after that the directors, claiming that Lucas had done nothing but nominal work after June, 1913, declared it in default and the electors, by a vote of the district in 1915, with almost unanimity declared the contract at an end. This suit was brought January 15, 1916.

Under the statute unless the directors are denied the right to exercise the power, or it is reserved to the electors, all the powers granted an irrigation district must be exercised by the board of directors. Power and discretion in the matters under consideration are not granted to individual taxpayers or to the court but to a board of directors with a referendum in some instances reserved to the voters. The board of directors, and the district upon a referendum vote of the electors, had the discretion to make the August 30, 1910 contract, and to declare it forfeited, or to breach it, and in the absence of fraud individual taxpayers cannot interfere with that discretion. Where discretion may be exercised by a municipality, it must be done by constituted authority, and the courts cannot, at the instance of a taxpayer, interfere with the exercise of such discretion or substitute the judgment of the court for the judgment of those in authority. A taxpayer may protect the rights of the municipality against the unlawful increase of taxes which would throw an unlawful charge or burden upon his property, but he cannot by the exercise of discretionary power vested in others force additional burdens and taxes upon the taxpayers of the municipality. A taxpayer as a rule in the absence of fraud has no capacity to bring an action for the district against the will, discretion and judgment of the board and the district in whom are vested by statute the power and authority to exercise such judgment, neither can the court exercise the discretion vested by law in the board or the electors. Discretion exercised by the proper authorities, unless abused, cannot be reviewed by the court at the instance of a tax-

payer.  *City of Denver.v. Kennedy,* 33 Colo. 80, 80 Pac. 122, 467; *City of Denver v. Campbell,* 33 Colo. 162, 80 Pac. 342; *Hildreth v. City of Longmont,* 47 Colo. 95, 105 Pac. 157; *Moffat et al. v. City and County of Denver,* 57 Colo. 473, 143 Pac. 577; *Thomas v. Grand Junction,* 13 Colo. App. 80, 87, 94, 56 Pac. 665; *Peake v. City of New Orleans,* 139 U. S. 342, 11 Sup. Ct. 541, 35 L. Ed. 131.

An individual taxpayer cannot compel the district to carry forward a project against the judgment and discretion of those in whom such matters rest by statute which would throw additional burdens upon the taxpayers.  The contract price for the system was $3,000,000 in bonds which would represent a charge of $50.00 an acre upon the 60,000 acres.  The amount of bonds outstanding represent a charge of $12.50 per acre.  The district, in order not to make any further charge upon the land, cancelled the contract nearly two years after it had been defaulted and they claimed the work abandoned, and a taxpayer cannot force a tax of $37.50 on every acre of land in the district against the will, discretion and judgment of the board and a majority vote of the electors and taxpayers of the district.  The board of directors claimed Lucas refused to complete the system according to the August 30, 1910 contract, plans and specifications; that he was in default; that the system he proposed to deliver under the invalid February 3, 1913 contract would be of no value to the district, and that it would be better to have a charge of $12.50 an acre on the land than to add a further charge of $37.50 an acre for what they considered was worthless.  They declared the contractor in default and the contract forfeited and abandoned and submitted the matter to the electors of the district who almost unanimously approved the action of the board.  Notwithstanding this, a taxpayer and land owner assumes to exercise the discretion vested in the board of directors and the district in such matters and claims the right to enforce specific performance of the contract in a court of equity against the will of the district.  The legislature never intended, in a matter of this kind, that the judgment and dis-

cretion of an individual taxpayer, or the court, should be substituted for the judgment and discretion of the constituted authorities of the district. Courts as a rule refuse to take upon themselves the judicial superintendence and execution of the performance of this kind of a contract, but leave the parties in case of a breach to their legal remedies.

This is not in conflict with the doctrine that a taxpayer' may bring an action to prevent the authorities of a municipality from paying out funds illegally, or from releasing obligations without consideration, or for relief against illegally refusing to perform duties which the law specifically enjoins and in which no discretion is to be exercised, or to prevent any act whereby a loss would be brought to the municipality when the act sought to be done is beyond the power of the authorities, or, under certain conditions, to enforce contracts for the payment of money, where the contracts are such that the performance or non-performance is a matter over which the municipal authorities have no discretion, but we know of no case sustaining a taxpayer's action brought against the discretion and judgment of the constituted authorities, vested by statute, with the power of exercising such judgment and discretion.

The findings of the lower court will be set aside, the judgment reversed and the cause remanded with directions to the lower court to dismiss the action without prejudice to the contract rights of the parties and their legal remedies.

MR. JUSTICE SCOTT, MR. JUSTICE TELLER, MR. JUSTICE BURKE and MR. JUSTICE DENISON concur in the conclusion.

MR. JUSTICE BAILEY and MR. JUSTICE ALLEN dissent.

*On Petition for Rehearing.*

GARRIGUES, C. J.

It is stated in paragraph 7 of the opinion that "A taxpayer as a rule in the absence of fraud has no capacity to bring an action for the district against the will, discretion and judgment of the board and the district in whom are

vested by statute the power and authority to exercise such judgment, neither can the court exercise the discretion vested by law in the board or the electors."

By this it is meant, as stated in the opinion, that they had no right to bring or maintain the action for the reasons therein given, and not that they were incapacitated under the Code from bringing the suit.